# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UGO COLELLA, *et al.*, | : | | |
| | : | | |
| Plaintiffs and Counter-Defendants, | : | Civil Action No.: | 20-813 (RC) |
| | : | | |
| v. | : | Re Document No.: | 28 |
| | : | | |
| THOMAS T. ANDROUS, *et al.*, | : | | |
| | : | | |
| Defendants and Counter-Plaintiffs. | : | | |

## MEMORANDUM OPINION

### DENYING COUNTER-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIM

## I. BACKGROUND

What began as a lawsuit two attorneys brought against former clients to recover allegedly unpaid legal fees has morphed, via a counterclaim, into a legal malpractice suit. The Court's previous opinion in the matter describes in detail the fee-recovery allegations, and the Court does not repeat that background in detail here. *Colella v. Androus*, 518 F. Supp. 3d 439, 442–44 (D.D.C. 2021). In short, Ugo Colella and John Zefutie represented Thomas Androus and two limited liability companies of which Androus was the sole and controlling member—2208 Russell Road, LLC and 2208 RR AVA, LLC—in a lawsuit against a construction contractor in Virginia state court. *Id.* at 442. Androus and his businesses allegedly failed to pay Colella and Zefutie for their services, so they filed the instant suit in this Court to recover their fees. *Id.* at 443. Androus, 2208 Russell Road, and 2208 RR AVA (together, "Counter-Plaintiffs") filed an answer, as well as a counterclaim against Colella and Zefutie (together, "Counter-Defendants") alleging legal malpractice in relation to the underlying Virginia lawsuit and related matters. Counterclaim at 19, ECF No. 26. Currently before the Court is Counter-Defendants' Federal Rule of Procedure 12(b)(6) motion to dismiss the Counterclaim for failure to state a claim. Mot.

Dismiss Counterclaim, ECF No. 28.  For the purpose of resolving this motion, the Court accepts the following allegations in the Counterclaim as true.  *See, e.g.*, *Robb v. Vilsack*, No. CV 20-0929, 2021 WL 3036796, at *1 n.2 (D.D.C. July 19, 2021).

In October 2015, 2208 Russell Road, LLC contracted to purchase an Alexandria, Virginia property (the "Alexandria Property") from Brian Thomas and Thomas Brothers Enterprises, LLC (together, "Thomas"), who were in the process of renovating a home on the property. Counterclaim ¶¶ 6–7, 10.  "As part of the purchase price, Androus signed a promissory note to Thomas in the amount of $1,600,000 (the 'Note'), secured by a Deed of Trust on the Property." *Id.* ¶ 7.  Androus grew concerned that Thomas's construction of the home on the property had been defective.  In August 2017, he retained Colella, who at the time was associated with the law firm of Duane Morris, to represent him in relation to a potential dispute between Androus and Thomas.  *Id.* ¶¶ 6, 8.  Within a week, Colella advised Androus via email of several claims he could potentially bring against Thomas: "violation of the Virginia Consumer Protection Act ('VCPA'); aiding and abetting violation of the VCPA; conspiracy to violate the VCPA; fraudulent inducement; fraud in the execution; negligent misrepresentation; and breach of contract."  *Id.* ¶ 9.

In October 2017, with Colella's assistance, 2208 Russell Road, LLC deeded the Alexandria Property to Androus, who then immediately deeded it to 2208 RR AVA.  *Id.* ¶ 10.  In April 2018, Thomas demanded from Androus $1,954,854.51 in payment on the Note.  Colella responded with a letter alleging construction defects worth over $1,000,000 and asserting  that Thomas had acted without a state contracting license, which according to Colella rendered him liable under the VCPA for treble damages in the amount of $3,000,000.  *Id.* ¶ 11.  Colella offered

that if Thomas would walk away from his claim on the Note, Androus would finish the construction using different contractors.  *Id.*

Instead of settling, Thomas sued Androus and his LLCs in Virginia state court, alleging that the transfers of the property between Androus and his LLCs were fraudulent conveyances intended to defeat his claims.  He sought a judgment declaring that he had a lien against the Alexandria Property.  *Id.* ¶  12.  Androus asked his attorney Colella if he should have 2208 RR AVA return the property to 2208 Russell Road, LLC, "in order to render [Thomas's complaint] moot."  *Id.* ¶ 13.  Colella advised that he should not, and that he instead should file a counterclaim against Thomas seeking damages for violations of the VCPA, fraudulent inducement, and breach of contract.  *Id.* ¶¶ 13, 15.  Androus took the advice and filed a counterclaim and third-party complaint against Thomas seeking, among other things, $2,000,000 in compensatory damages, treble damages under the VCPA, and punitive damages.  *Id.* ¶ 15.  Thomas responded with an amended complaint, which added causes of action and sought $1,600,000 in damages on the Note.  *Id.* at 16.  The case proceeded toward trial.

"Throughout his representation of Androus," including "shortly before trial," Colella had advised Androus of two key legal theories.  *Id.* ¶ 14.  First, he "estimated that Counter-Plaintiffs had incurred actual damages of $1,200,000, which could be trebled to $3,600,000 under the VCPA."  *Id.*  Second, he "advised Androus that [he and his LLCs] had a viable claim for punitive damages, which could result in up to nine times the actual damages (i.e. $10,800,000), as well as a claim for attorneys' fees, estimated at $400,000."  *Id.*  Colella never told Androus about Va. Code Ann. § 8.01-38.1, which provides that "[i]n any action accruing on or after July 1, 1988 . . . [i]n no event shall the total amount awarded for punitive damages exceed $350,000." *See* Counterclaim ¶ 14.

Before trial, Colella and Zefutie left Duane Morris for Culhane Meadows, PLLC, but they signed an engagement letter stating that they would continue to represent Androus and his LLCs in the pending lawsuit against Thomas. *Id.* ¶ 18–20. Zefutie "assisted Colella with the preparation for and conduct of the trial." *Id.* ¶ 20. Naturally, preparation for trial involved readying witnesses. Although Colella discussed with Androus the need to present expert witnesses, he relied on Androus to select the experts himself, "without advising Androus that he should not retain an expert with whom he had a personal relationship." *Id.* ¶ 21. Androus selected his "neighbor and friend" Jeffrey Resetco "as a construction expert," and selected Randy Harding—"a friend of Androus' since high school"—"to offer an estimate of the cost of repair." *Id.*

In addition to leaving the selection of these witnesses up to Androus, neither Androus nor Zefutie supervised Harding's preparation. *Id.* ¶ 22. Harding duly authored a report which estimated the costs of repairing the defects ($859,172), but Androus considered the estimate to be too high based on his own experience in the business. *Id.* He therefore "edited the report and revised the estimate down to $598,386.75." *Id.* Androus delivered the revised report to Colella, who did not ask any questions about it. *Id.* Thus, when preparing Harding for his deposition, "Colella and/or Zefutie failed to alert Harding to the fact that Androus had revised Harding's estimate downward." *Id.* ¶ 24. So when counsel for Androus confronted Harding with an estimate significantly lower than the one he had prepared, he became "confused" and his "credibility [was] diminished." *Id.* Androus asked about obtaining new estimates, but Colella advised that new estimates were not necessary. *Id.*

As for Resetco, "[w]ith Colella and Zefutie's knowledge and consent, Androus himself prepared a lengthy, detailed report concerning the nature and extent of the construction defects."

*Id.* ¶ 23.  Androus attached to the report a one-page letter from Resetco, which stated that he had reviewed Androus's report and had repeatedly visited the property to confirm that  the report's description of the construction deficiencies was accurate.  *Id.*  The letter also stated that Resetco agreed with the estimated repair costs in the Harding Report.  *Id.*

Just before trial, Androus asked about pursuing mediation, but "Colella and Zefutie responded that there was no time for mediation; all efforts had to be devoted to trial preparation." *Id.* ¶ 25.  Androus had also repeatedly told Colella and Zefutie that he was interested in settling the case.  *Id.*  Colella and Zefutie pushed back, "insist[ing] that Counter-Plaintiffs had very substantial claims and a very good chance to win at trial, and they did not engage in meaningful settlement discussions with counsel for Thomas."  *Id.*

But trial did not go well for Androus and his LLCs.  When Androus attempted at trial to introduce Harding's estimate (as revised downward by Androus), the trial court excluded it.  *Id.* ¶ 24.  Thus, "Colella and Zefutie were unable to introduce any estimates for the total repair of all the construction defects" at trial.  *Id.* ¶ 28.  Opposing counsel emphasized to the jury the conveyance of the Alexandria Property, "which had been sanctioned and abetted by Colella."  *Id.* ¶ 29.  According to Androus, Colella was "overly aggressive" at trial; for example, he called Thomas a "liar."  *Id.* ¶ 27.  In the end, the jury returned a verdict against Androus and his LLCs of $2,400,000.  *Id.* ¶ 30.  Because of the fee dispute discussed above, Colella and Zefutie refused to appeal, so Androus had to hire new counsel to do so.  *Id.* ¶ 32.

Based on these allegations, Androus and his LLCs counterclaim in this action for legal malpractice, asserting that Colella and Zefutie breached their duties of care in six ways:

- "Incorrectly advising Counter-Plaintiffs that they had a viable claim for punitive damages against Thomas."  *Id.* ¶ 37.
- "Incorrectly advising Counter-Plaintiffs that they had a very strong case against Thomas based on [his] lack of a construction license."  *Id.*

- "Incorrectly advising Counter-Plaintiffs that there was nothing wrong with conveying the Property to 2208 RR AVA, assisting them with that transaction, and advising them not to convey the Property back to 2208 Russell Road after Counter-Plaintiffs were sued for fraudulent conveyance by Thomas." *Id.*

- "Failing to manage and supervise the selection and preparation of expert witnesses to support Counter-Plaintiffs' claims, including but not limited to failing to alert Harding before his deposition that Androus had revised his estimate of repair downward." *Id.*

- "Failing to engage in significant settlement negotiations with Thomas prior to trial, despite Androus' requests to do so, and instead encouraging Counter-Plaintiffs to go to trial with the expectation of a large verdict in Counter-Plaintiffs' favor." *Id.*

- "Utilizing an overly aggressive litigation style at trial, which antagonized the judge and the jury." *Id.*

Androus alleges that these breaches proximately caused damages in the form of the adverse trial judgment, which remains unpaid and has grown to $2,600,000 with post-judgment interest; "[o]verpayment" of $300,000 in attorneys' fees for subpar services; appellate fees to remedy the trial judgment; and the cost of the required bond pending appeal. *Id.* ¶ 38.

## II.  LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" sufficient to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that standard; it asks whether the plaintiff has properly stated a claim. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56

(citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.  However, a court considering a motion to dismiss must accept the complaint's factual allegations as true and construe them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  Put another way, the court must "draw all reasonable inferences" in favor of the plaintiff.  *DC2NY, Inc. v. Acad. Express, LLC*, 485 F. Supp. 3d 113, 118 (D.D.C. 2020).

### III.  ANALYSIS

"To succeed on a legal malpractice claim [under District of Columbia law], the plaintiff must show that (1) the defendant was employed as the plaintiff's attorney, (2) the defendant breached a reasonable duty, and (3) that breach resulted in, and was the proximate cause of, the plaintiff's loss or damages."[1]  *Seed Co. Ltd. v. Westerman, Hattori, Daniels & Adrian, LLP*, 961

---

[1] Both parties draw upon District of Columbia law for their arguments about the legal malpractice claims.  Mem. P. & A. Supp. Pls.'/Counter-Defs.' Mot. Dismiss Counterclaim at 7 ("Mem."), ECF No. 28-1; Defs.'/Counter-Pls.' Opp'n Pls.'/Counter-Defs.' Mot. Dismiss Counterclaim at 4, 8 ("Opp'n"), ECF No. 29.  Of course, a significant portion of the events underlying the claims took place in Virginia, and Counter-Plaintiffs state in a passing footnote that "[t]he question of whether to apply District of Columbia or Virginia law to the issues raised by this motion has not been briefed and is not clear."  Opp'n at 11 n.2.  That passive formulation elides that the responsibility to brief any choice-of-law issue lies with the parties.  The parties have not established whether there is any conflict between D.C. and Virginia law that is relevant to the issues presented in the instant motion, and the allegations in the complaint alone do not provide a sufficient basis to resolve any choice of law question that might arise (for example, it is unclear at this time whether Colella and Zefutie provided certain of their advice in D.C. or Virginia).  Accordingly, the Court applies D.C. law by default for the purpose of resolving this motion, but the parties may raise the issue again if they wish "after an opportunity for discovery."  *See Jones v. Lattimer*, 29 F. Supp. 3d 5, 10 n.3 (D.D.C. 2014); *Beach TV Props., Inc. v. Solomon*, 306 F. Supp. 3d 70, 92 (D.D.C. 2018).

F.3d 1190, 1196 (D.C. Cir. 2020) (quoting *Martin v. Ross*, 6 A.3d 860, 862 (D.C. 2010)).

Counter-Defendants argue that the counterclaim fails to plausibly allege the breach and causation

elements in relation to several of Counter-Plaintiffs' legal malpractice theories.  *See* Mem. at 8.

They further argue that any malpractice claim related to advice regarding the conveyance of the

Alexandria Property between Androus-owned entities is barred by the statute of limitations and

the doctrines of *in pari delicto* and judicial estoppel.  *See id.* at 15–20.  Finally, they assert that

the counterclaim does not sufficiently allege that Zefutie was involved in any of the alleged

breaches of the duty of care, so it fails to state any claims against him.  *See id.* at 8–9.  The Court

first addresses the sufficiency of the allegations against Colella before turning to those against

Zefutie.  It concludes that the Counterclaim states legal malpractice claims against both Counter-

Defendants.

      One preliminary note: Counter-Defendants attached to their motion to dismiss significant

excerpts from the record of the trial court action, and ask the Court to take judicial notice of

these documents.  Counter-Plaintiffs do not object.  Public documents from other court

proceedings are judicially noticeable and permissible to consider when resolving a Rule 12(b)(6)

motion, so the Court considers them here.  *Lewis v. Drug Enf't Admin.*, 777 F. Supp. 2d 151, 159

(D.D.C. 2011), *aff'd*, No. 11-5152, 2012 WL 1155698 (D.C. Cir. Mar. 8, 2012).

### A.  The Counterclaim States a Legal Malpractice Claim Against Colella

1.  Counter-Plaintiffs Plausibly Plead the Breach and Causation Elements of their Claims

      *Breach and causation regarding VCPA advice.*  Colella advances three related arguments

to the effect that Counter-Plaintiffs' allegation that Colella breached his professional duty of care

by advising them "that they had a very strong case against Thomas based on [Thomas's] lack of

a construction license" fails to state a legal malpractice claim.  Counterclaim ¶ 37(b).  Colella

contends that this advice was substantively correct and therefore not a breach of his duty; he

alternatively claims that even if the advice was mistaken in some way, it nevertheless cannot ground a legal malpractice claim because of the judgmental immunity rule. Mem. at 11–12, 13–14. Colella also argues that the Counterclaim does not sufficiently allege that his VCPA advice caused Counter-Plaintiffs any harm. Mem. at 13.

Resolution of these arguments requires the Court to clear up which of two distinct pieces of advice related to Thomas's lack of a construction license serves as the basis for Counter-Plaintiffs' legal malpractice claim. The Counterclaim alleges that Colella advised Androus that Thomas's lack of a license violated the VCPA and therefore gave Counter-Plaintiffs an affirmative VCPA claim against Thomas for treble damages up to $3,600,000, and that based in part on this understanding, Colella advised Androus to file and pursue at trial a counterclaim for damages against Thomas. Counterclaim ¶¶ 11, 13–14. Colella's brief largely focuses on a second piece of advice he says he gave regarding the license rule, namely that the lack of a construction license afforded Counter-Plaintiffs a *defense* to Thomas's breach-of-contract claims. *See* Mem. at 11–13. But this focus is a distraction: the Court understands Counter-Plaintiffs' malpractice claim to rest instead on the advice regarding the potential for a large damages recovery on an affirmative VCPA claim. *See* Counterclaim ¶¶ 11, 13–14, 35 ("Counter-Plaintiffs went into the trial expecting to win a substantial verdict, based largely on Counter-Defendants' repeated assurances that the licensing issue was an almost sure winner."); Opp'n at 7 ("[R]ather than explain the murky nature of the law and that the lack of a license was not necessarily fatal to Thomas' claims, as the statutory amendments and case law suggest, Counter-Defendants advised Androus that Counter-Plaintiffs' claim under the VCPA was worth over $3,000,000, including treble damages.").

The question of whether an attorney breached the professional standard of care is not easily answered at the Rule 12(b)(6) stage.  Indeed, "[u]nless the attorney's lack of care is so obvious that the jury can find negligence as a matter of common knowledge, the standard and its violation must be proved by expert testimony."  *Mills v. Cooter*, 647 A.2d 1118, 1123 (D.C. 1994).  The application of the judgmental immunity rule likewise does not easily submit to pleading-stage resolution.  This "doctrine provides that an informed professional judgment made with reasonable care and skill cannot be the basis of a legal malpractice claim.  Central to the doctrine is the understanding that an attorney's judgmental immunity and an attorney's obligation to exercise reasonable care coexist such that an attorney's non-liability for strategic decisions is conditioned upon the attorney acting in good faith and upon an informed judgment after undertaking reasonable research of the relevant legal principals and facts of the given case." *Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 666 (D.C. 2009) (cleaned up).  Thus, in *Biomet*, the court noted that  "the reasonableness of an attorney's litigation strategy" is not always "susceptible to resolution" even at the summary judgment stage.  *Id.* at 665.

Colella argues that his advice on the license issue was at least a reasonable evaluation of Virginia law, and relies on *Mills* to argue that the mere fact that the jury sided against Androus on the affirmative VCPA claim does not prove otherwise.  Mem. at 14.  This argument is flawed in two ways.  First, *Mills* was an appeal of a post-trial motion for judgment notwithstanding the verdict; Colella does not cite any authority to support the proposition that an adverse jury determination cannot lend plausibility to Counter-Plaintiffs' allegation that Colella's advice of a strong chance at a VCPA damages recovery breached the standard of care.  *Mills*, 647 A.2d at 1119.  Second, the parties' briefing on Virginia law does not allow the Court, at this stage, to conclude that Colella's advice was either substantively correct or based on a reasonably

informed professional judgment such that Counter-Plaintiffs' claim fails as a matter of law.  In fact, though the Court reserves final judgment until the parties fully brief the issue, it appears that Colella's advice may have been substantively wrong.  *See Biomet*, 967 A.2d at 668 (whether an attorney's strategy was reasonable in the context of the judgmental immunity "requires consideration of the state of the law" at the time the attorney made the strategic decision).

Va. Code Ann. § 54.1-1103 requires that those who engage in contracting work in Virginia have a state license to do so.  Colella spends most of his briefing on this issue explaining the way this requirement interacts with breach-of-contract disputes involving unlicensed contractors (so, for that matter, do the Counter-Plaintiffs): "A construction contract entered into by a person undertaking work without a valid Virginia contractor's license shall not be enforceable by the unlicensed contractor undertaking the work unless the unlicensed contractor (i) gives substantial performance within the terms of the contract in good faith and (ii) did not have actual knowledge that a license or certificate was required by this chapter to perform the work for which he seeks to recover payment."  *Id.* § 54.1-1115(C); *see* Mem. at 11–12; Opp'n at 5–7.  But as the Court has explained, the legal malpractice claim does not appear to rely on Colella's advice concerning this defense.  Instead, it relies on Colella's advice that the license statute gave Counter-Plaintiffs an *affirmative* claim for treble damages against Thomas. Colella devotes a grand total of one sentence to the provision that presumably grounded this piece of advice.  *Mem.* at 11.  Va. Code Ann. § 54.1-1115(B)(i) provides that undertaking contracting work without a license, in addition to subjecting the contractor to criminal penalties, "shall also constitute a prohibited practice in accordance with § 59.1-200 [of the Virginia Consumer Protection Act], provided that the violation involves a consumer transaction as defined in the Virginia Consumer Protection Act (§ 59.1-196 et seq.), and shall be subject to any

and all of the enforcement provisions of the Virginia Consumer Protection Act." The "enforcement provision[] of the Virginia Consumer Protection Act" relevant to Colella's advice must have been its private cause of action, which provides:

> Any person who suffers loss as the result of a violation of this chapter shall be entitled to initiate an action to recover actual damages, or $500, whichever is greater. If the trier of fact finds that the violation was willful, it may increase damages to an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater.

Va. Code Ann. § 59.1-204.

So far, so good for Colella's advice. But recall that a violation of the contractor license requirement qualifies as a prohibited practice under the VCPA *only* "provided that the violation involves a consumer transaction as defined in the Virginia Consumer Protection Act." Va. Code Ann. § 54.1-1115(B)(i). The VCPA defines consumer transaction, in relevant part, as "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services *to be used primarily for personal, family or household purposes*." Va. Code Ann. § 59.1-198 (emphasis added). The allegations in the Counterclaim do not make it clear that the Androus and his LLCs used Thomas's contracting services primarily for personal, household, or family purposes. In fact, the counterclaim contains allegations that at least plausibly suggest they did not. "Androus is in the real estate business and knowledgeable about construction issues." Counterclaim ¶ 8. Moreover, the Alexandria Property transaction involved two separate LLCs, one of which was the direct purchaser—hardly an indicator, though not necessarily preclusive, of personal, household, or family use. *Id.* ¶ 10. It is at least plausible that Counter-Plaintiffs never had a viable affirmative VCPA claim based on plain statutory requirements, and that Colella's advice therefore breached his duty of care and was not sufficiently informed to merit the protection of the judicial immunity rule. To be sure, the Court does not have the benefit of full briefing on the scope of a lack-of-license-based VCPA cause of action, and does not reach any

firm conclusion on whether Counter-Plaintiffs did or did not have a viable affirmative VCPA claim.  Rather, the Court holds that Colella's memorandum in support of his motion to dismiss fails to convince that advising the Counter-Plaintiffs that they had a good chance at a substantial VCPA recovery was either substantively correct or a reasonably informed judgment as a matter of law, and that the Counterclaim plausibly alleges otherwise.  In other words, the Counterclaim plausibly alleges that Colella's advice was based on "oversight or neglect" of a significant weakness in Counter-Plaintiffs' VCPA claim, which is enough to plead a breach of the duty of care outside the protection of the judgmental immunity rule at the motion-to-dismiss stage.  *See Biomet*, 967 A.2d at 666.

Colella suggests that his advice must have been correct, or that it at least did not cause Counter-Plaintiffs any harm, because the Virginia court allowed the affirmative VCPA claim to go to the jury and instructed the jury that lack of a contractor's license is a VCPA violation. "One can only assume," Colella writes, "that the [Virginia c]ourt would not have allowed a meritless claim to go the jury."  Mem. at 13.  Not so.  For one thing, Colella attached only certain excerpts from the Virginia-court record, and these do not establish whether Thomas even presented to the Virginia court an argument that the VCPA claim should not go to the jury.  The Court cannot infer anything about the viability of the affirmative VCPA claim from the mere possibility of a Virginia court ruling on an issue it may not have even confronted.  For another, it is at least plausible that whether the Alexandria Property transaction qualified as a "consumer transaction" was a disputed issue at trial, and that the jury sided against Counter-Plaintiffs on their affirmative VCPA claim because they concluded it did not so qualify.  The jury instructions Colella excerpts include an instruction on the "consumer transaction" requirement: "Any person who undertakes work as a contractor without a valid Virginia contractor's license . . . has

engaged in a prohibited practice in violation of the Virginia Consumer Protection Act, provided the violation involves a 'consumer transaction' as defined by the Virginia Consumer Protection Act." Mot. Dismiss Counterclaim Ex. D at 5, ECF No. 28-5. The excerpted instructions do not go on to define "consumer transaction," but Colella does not purport to provide a complete copy of the jury instructions.

Moreover, and in response to Colella's causation argument, Counter-Plaintiffs' malpractice claim does not rest solely on the fact that they lost at trial on the VCPA claim. They also allege that they would not have incurred the expense of pursuing a VCPA counterclaim against Thomas in the first place (and/or would have settled before trial) were it not for Colella's advice that they had a "very strong" VCPA claim for substantial treble damages. *See* Counterclaim ¶¶ 11, 14, 25, 37, 38. Thus, Colella misconstrues the nature of Counter-Plaintiffs' claim when he insists that "[a]n adverse jury verdict standing alone cannot be the basis for a malpractice claim." Mem. at 13. Read in the light most favorable to Counter-Plaintiffs, the Counterclaim alleges not only that Colella's faulty evaluation of the VCPA claim was partially responsible for Counter-Plaintiffs' loss at trial, but also that it caused them to "[o]verpay" in attorneys' fees by misleading them into pursuing the doomed project of bringing a VCPA counterclaim and litigating it to trial in the first place. Counterclaim ¶¶ 13–15, 38. This is not a case in which the plaintiff alleges *only* that attorney malpractice caused him to fail to recover on an otherwise viable claim; rather, Counter-Plaintiffs allege that Counter-Defendants negligently overstated the viability of their claim and therefore caused them to pursue it when they otherwise would not have.[2]

---

[2] For the first time in his reply brief, Colella attaches and invokes a document in which Androus took notes evidencing an understanding that one possible outcome of the trial was an adverse judgment of over $2,000,000. Reply Mem. Further Supp. Counter-Defs.' Mot. Dismiss

For what it is worth, the Court agrees with Colella that Counter-Plaintiffs' complaints about Colella's presentation style before the jury likely would not on their own suffice to state a claim for legal malpractice. Mem. at 25–26. The only specific fact alleged in support of the Counterclaim's allegations that "Colella exhibited overly aggressive behavior" at trial and that "the jury was clearly unimpressed" is the allegation that Colella referred to Thomas as liar in his opening statement. Counterclaim ¶ 27. Casting doubt on the credibility of an adverse party hardly seems overly aggressive; in any event, Colella's decision to call Thomas a liar during his opening statement represents the sort of reasonable choice of "trial tactic[]" that lies at the heart of the judgmental immunity doctrine. *See Biomet*, 967 A.2d at 666. But all of this is neither here nor there, because other Counterclaim allegations suffice to state a legal malpractice claim. *Cf. Harmoni Int'l Spice, Inc. v. Wenxuan Bai*, No. 216-cv-00614, 2019 WL 4194306, at *8 (C.D. Cal. July 2, 2019) ("[T]he Court notes that even if these allegations are immaterial, they provide 'a background and important factual underpinning' to Plaintiffs' claims and provide at least some context about what happened in this case (citation omitted)).

   *Causation regarding remaining alleged errors.* For purposes of the motion to dismiss, Colella appears not to detail an argument that Counter-Plaintiffs' remaining alleged errors—including Colella's failure to advise Androus of Virginia's punitive damages cap, the

---

Counterclaim ("Reply") at 3, ECF No. 30; Reply Ex. J at 3, ECF No. 30-1. Colella suggests that this document defeats the notion that any of his advice caused Androus to pursue a faulty litigation strategy. Reply at 3–4. But it does not conclusively so establish; for example, it does not reveal whether Colella's advice led Androus to understand that an adverse judgment was a likely outcome at trial, an unlikely outcome, or something in between. In any event, the Counterclaim neither attaches, references, nor necessarily relies upon this document, so it is not properly before the Court at the Rule 12(b)(6) stage. *See Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011); *Compton v. Alpha Kappa Alpha Sorority, Inc.*, 64 F. Supp. 3d 1, 11–12 (D.D.C. 2014); *Cogdell v. Murphy*, No. CV 19-2462, 2020 WL 6822683, at *3 (D.D.C. Nov. 20, 2020).

shortcomings in expert preparation, and the failure to engage in settlement discussions—were not breaches of the duty of care.  He instead focuses on arguing that the Counterclaim does not plausibly plead that these errors caused any injury.  "As with any tort action, legal malpractice liability is predicated on a finding that the injury was proximately caused by the breach of duty. Proximate cause exists when there is a substantial and direct causal link between the attorney's breach and the injury sustained by the client."  *Dalo v. Kivitz*, 596 A.2d 35, 41–42 (D.C. 1991) (cleaned up).  Contrary to Colella's assertions, as the Court will explain, the Counterclaim plausibly alleges proximate cause with respect to each of these alleged errors.

In addition to alleging that Colella negligently mischaracterized the prospect of Counter-Plaintiffs' recovery on a VCPA claim, Counter-Plaintiffs allege that Colella incorrectly advised them that they had a viable chance at recovering punitive damages up to $10,800,000.[3] Counterclaim ¶ 14, 37.  This was a severe misstatement of Virginia law, which caps punitive damages recoveries at $350,000.  *See id.* ¶ 14; Va. Code Ann. § 8.01-38.1 ("In any action accruing on or after July 1, 1988, including an action for medical malpractice under Chapter 21.1 (§ 8.01-581.1 et seq.), the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact.  In no event shall the total amount awarded for punitive damages exceed $350,000.").  Colella does not contend that the cap did not apply to Counter-Plaintiffs' Virginia case.  Instead, he points out that while the Virginia judge

---

[3] The record does not entirely clarify in relation to which of their counterclaims against Thomas Counter-Plaintiffs sought punitive damages.  Punitive damages would not have been recoverable in connection with the breach-of-contract claim against Thomas, but may have been recoverable in connection with the fraudulent inducement claim against Thomas.  *See Wackenhut Applied Techs. Ctr., Inc. v. Sygnetron Prot. Sys., Inc.*, 979 F.2d 980, 984 (4th Cir. 1992); *Tidewater Beverage Servs., Inc. v. Coca Cola Co.*, 907 F. Supp. 943, 948 (E.D. Va. 1995); *see also* Counterclaim ¶ 15 (noting that Counter-Plaintiffs counterclaimed against Thomas in the Virginia action for violation of the VCPA, breach of contract, fraudulent inducement, and a declaratory judgment "to remove a cloud on the title to the Property").

instructed the jury that it could award punitive damages against Thomas if it found that he had acted willfully and with actual malice, the instruction did not mention any damages cap.  Mem. at 10.  Colella seems to argue that because the jury never had occasion to consider the damages cap, his failure to advise on the cap could not have caused Counter-Plaintiffs' failure to recover punitive damages from Thomas.  *See id.*

This argument suffers from two fundamental flaws.  First, it misapprehends how Virginia's punitive damages cap operates by failing to account for the two concluding sentences of the four-sentence statute.  The statute reads in full:

> In any action accruing on or after July 1, 1988, including an action for medical malpractice under Chapter 21.1 (§ 8.01-581.1 et seq.), the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact.  In no event shall the total amount awarded for punitive damages exceed $350,000.  **The jury shall not be advised of the limitation prescribed by this section.  However, if a jury returns a verdict for punitive damages in excess of the maximum amount specified in this section, the judge shall reduce the award and enter judgment for such damages in the maximum amount provided by this section.**

Va. Code Ann. § 8.01-38.1 (emphasis added).  Thus, Colella's observation that the jury instructions did not reference the cap is entirely irrelevant; this omission was standard procedure. The statute plainly contemplates allowing the jury to award whatever punitive damages it sees fit and requiring the judge to then reduce them consistent with the cap after trial.  The jury instruction only underscores the severity of Colella's alleged error in advising Androus that he stood to recover up to $10,800,000 in punitive damages.

Second, and like the argument about the alleged VCPA error, Colella's causation argument about the alleged damages cap error misunderstands the Counterclaim in that it assumes it to allege that the damages cap error caused harm only by preventing Counter-Plaintiffs from obtaining a damages verdict in their favor.  Once again, Counter-Plaintiffs allege that this error harmed them by setting them on the strategically misguided and expensive path of

17

filing and trying a counterclaim for millions of dollars in punitive damages against Thomas—an effort that, because of the damages cap Colella neglected to advise them of, was destined to fail. Counterclaim ¶¶ 13–15, 38.  Colella's causation argument is not responsive to these allegations.

Next comes a set of arguments about the Counterclaim's allegations related to witness preparation.  Counter-Plaintiffs allege that Colella failed to supervise Randy Harding's preparation of an estimate of the costs Thomas's defective construction had inflicted upon Androus.  Counterclaim ¶ 22.  Upon receipt of Harding's estimate, Androus concluded that it was too high and revised it downward.  *Id.*  This resulted in Harding being confronted with an estimate he had never seen before and could not personally vouch for at his deposition, and ultimately, in the Virginia court's rejection of Counter-Plaintiffs' attempt to introduce the estimate at trial.  *Id.* ¶ 24.  According to Counter-Plaintiffs, this failure to supervise the witness preparation process contributed to Counter-Plaintiffs' "crushing defeat" at trial.  *Id.* ¶ 35.  Colella responds with an argument that the allegations suggest that Androus did not alert Colella that he had revised the estimate downward, so Colella lacked an opportunity to do anything about it. Mem. at 22; *see* Counterclaim ¶ 22 (noting that Androus revised the estimate downward and "delivered the revised estimate to Colella, who did not ask any questions about what he had received from Androus").  Colella further notes that his engagement agreement with Androus (which was attached to the original complaint in this case) provided that the firm was "not responsible for independently verifying the truth or accuracy of information supplied" by Androus and that the firm would rely on Androus to review for correctness all documents to be filed in court.  Mem. at 23 (citation omitted).  Even so, it was plausibly reasonable for Androus to expect that his attorney would actively involve himself in understanding the preparation process behind a witness estimate report.  In at least some jurisdictions, "[a]n attorney has an

18

ethical duty to prepare a witness." *Odone v. Croda Int'l PLC.*, 170 F.R.D. 66, 69 (D.D.C. 1997)

(Attridge, Mag. J.); *State ex rel. Means v. King*, 520 S.E.2d 875, 882 (W. Va. 1999) ("[A]n

attorney has an ethical duty to prepare a witness for a deposition."); *see* Jeffrey S. Kinsler & Jay

E. Grenig, *Consultation with Counsel*, Va. Prac. Civ. Discovery § 6:36 (2021) (referring to an

"attorney's ethical duty to prepare a witness").  Indeed, Androus has alleged that this was his

expectation.  *See* Counterclaim ¶ 22 (alleging that the "entire process" of Harding's estimate

preparation "was unsupervised by Colella or Zefutie, even though they had been paid hundreds

of thousands of dollars in legal fees by then"); *id.* ¶ 23 (alleging that Colella and Zefutie had

knowledge of the manner of preparation of the report of Resetco, another witness for Androus).

Thus, Androus has plausibly alleged that Colella's inaction, and not his own silence, caused the

deficiencies in Harding's preparation.[4]

Moreover, Colella learned of the downward revision to the estimate report at least during

Harding's deposition.  *See id.* ¶ 24.  He could have done something about it then; indeed, after

the deposition, Androus directly asked Colella if he should obtain new estimates and Colella

advised him that doing so was not necessary.  *Id.*  This failure to remedy the problem allegedly

caused the later failure to introduce Harding's estimate at trial, which allegedly helped cause the

adverse verdict.  *Id.*  Counter-Plaintiffs have plausibly alleged that the deficiencies in Harding's

witness preparation were a "substantial and direct" cause of their adverse litigation outcome.[5]

---

[4] To the extent Colella's contentions on this score are meant to suggest that Counter-Plaintiffs' have not plausibly alleged a breach of duty in relation to Harding's preparation, the Court rejects this argument for the same reasons it rejects the causation argument.

[5] The Court agrees with Colella that while the Counterclaim details alleged shortcomings in the preparation of Resetco's expert report, Counterclaim ¶¶ 21, 23, it does not specifically allege how these defects caused Counter-Plaintiffs any harm.  Mem. at 21.  Counter-Plaintiffs say that allowing Androus to select Resetco as an expert even though the two men had a personal relationship "made [Resetco] unnecessarily susceptible to accusations of lack of objectivity and bias," but do not allege (in their Counterclaim or briefs) that opposing counsel ever made any

*Dalo*, 596 A.2d at 42 (cleaned up).  Whether they can ultimately so prove is a question for another day.[6]

Colella's final causation argument responds to Counter-Plaintiffs' allegations regarding settlement opportunities, which assert that Counter-Plaintiffs notified Colella and Zefutie "several times" before trial that they were interested in settling and/or mediating the case, but Colella and Zefutie refused to engage in settlement discussions—all because of Colella and Zefutie's insistence that Counter-Plaintiffs had a good chance of winning a large judgment at trial.  Counterclaim ¶¶ 25, 37.  This allegedly caused Counter-Plaintiffs to undertake the expense of proceeding to trial on a flawed theory, where they suffered a substantial adverse judgment, which further caused them to incur the costs of appeal.  *See id.* ¶ 37.  Colella says that legal malpractice claims based on the loss of a settlement opportunity are categorically "inherently speculative" as a matter of law, but each of the authorities he relies on—none of which applies D.C. law—grounds its conclusion that a claim regarding settlement value was speculative on record evidence at summary judgment or a later stage, rather than relying on the pleadings.  *Zee Co., Inc. v. Williams, Mullen, Clark & Dobbins, P.C.*, 871 F. Supp. 2d 498, 511–12 (E.D. Va. 2012), *aff'd*, 547 F. App'x 166 (4th Cir. 2013); *Whiteaker v. State*, 382 N.W.2d 112, 117 (Iowa 1986); *McConwell v. FMG of Kansas City, Inc.*, 861 P.2d 830, 840–50 (Kan. Ct. App. 1993);

---

such accusations.  Opp'n at 9.  In any event, Counter-Plaintiffs' allegations regarding Harding are sufficient to plead their legal malpractice claim.

[6] Colella briefly notes that Harding testified at trial as a fact witness (contrary to the Counterclaim's reference to Harding as an expert witness), and that while Counter-Plaintiffs were unable to introduce Harding's estimate for the cost of repairs to the interior of the Alexandria Property because Harding could not authenticate it, they did introduce at trial Harding's estimates for costs related to siding and the ridge vent.  Mem. at 22, Mot. Dismiss. Ex. I at 33, 39–40, 42, 44, ECF No. 28-10.  The current record does not equip the Court to evaluate the relative importance of these estimates or the effect of the interior estimate's omission on the ultimate outcome of the case.

*Thompson v. Halvonik*, 43 Cal. Rptr. 2d 142, 146 (Cal. Ct. App. 1995); *McCartney v. Dunn &*

*Conner, Inc.*, 563 A.2d 525, 530 (Pa. Super. Ct. 1989); *Campbell v. Magana*, 8 Cal. Rptr. 32, 36

(Cal. Dist. Ct. App. 1960).

  Though the D.C. Court of Appeals does not seem to have directly weighed in on the

subject, at least once court in this district applying D.C. law has observed that "a cause of action

may exist under some circumstances against an attorney for failure to negotiate a reasonable

settlement of a case." *Macktal v. Garde*, 111 F. Supp. 2d 18, 22 (D.D.C. 2000), *aff'd*, No. 00-

7207, 2001 WL 238170 (D.C. Cir. Feb. 23, 2001); *see also Seed Co., Ltd. v. Westerman*, 840 F.

Supp. 2d 116, 125–26 (D.D.C. 2012) (allowing plaintiffs the opportunity to conduct discovery in

order to adduce evidence in support of their theory "that they acted in reliance on [defendant

attorneys'] erroneous legal advice when they declined . . . settlement offers").  To be sure,

Counter-Plaintiffs do not expressly allege that Thomas would have accepted a settlement offer or

even listened to one.  *See* Mem. at 24.  But it is reasonable to infer that Thomas, facing a

counterclaim for substantial damages, would have at least entertained an offer to settle his

original claims.  At the very least, accepting the Counterclaim allegations as true, Colella and

Zefutie's refusal to even explore the possibility of a settlement plausibly may have deprived

Counter-Plaintiffs of the opportunity to avoid an expensive and futile trial undertaking.  Again,

whether Counter-Plaintiffs can ultimately establish that Colella and Zefutie's refusal to even

explore settlement caused them any harm is a question of proof, not pleading.  *See District of*

*Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005) ("Proximate cause is generally a factual

issue to be resolved by the jury . . . ."); *cf. Seed Co.*, 840 F. Supp. 2d at 126 n.10 (declining to

require legal malpractice plaintiffs to "demonstrate that if they had accepted [a] settlement offer,

they would have made more money than they lost" because "such [a] factual showing[] . . . [was]

not appropriate at the pre-discovery stage of [the] litigation" where the "plaintiffs . . . ha[d] sufficiently alleged that they lost money (an injury) as a result of their reliance on erroneous legal advice (causation)").

2. Counter-Defendants' Statute of Limitations, *In Pari Delicto*, and Judicial Estoppel Arguments Do Not Justify Dismissal of the Counterclaim

The remaining way in which Counter-Plaintiffs allege Colella breached his duty of care was by advising them in relation to the transfer of the Alexandria Property from 2208 Russell Road, LLC through Androus to 2208 RR AVA without alerting them that these conveyances could expose them to a fraudulent transfer claim from Thomas, and by advising Androus not to reverse the transactions once he was hit with the fraudulent transfer suit.  Counterclaim ¶¶ 10, 13, 37.[7]  Colella asks the Court to hold that any claim based on this advice must be dismissed based on statute of limitations, *in pari delicto*, and/or judicial estoppel defenses, but the motion-to-dismiss-stage record does not permit the Court to hold that any of these defenses apply.

*Statute of limitations.*  Colella characterizes advice related to these transfers as an engagement distinct from his representation of Counter-Plaintiffs in their dispute with Thomas, and argues that any claim related to the transfer representation is untimely under D.C.'s three-year statute of limitations for legal malpractice claims.  Mem. at 18–19; *see Seed Co., Ltd. v. Westerman*, 832 F.3d 325, 331–32 (D.C. Cir. 2016) (applying the three-year statute of limitations found in D.C. Code § 12-30(8) to a D.C.-law legal malpractice action brought in federal court).  Specifically, Colella argues that the transfer representation ended when the transfers were finalized on October 24, 2017, Counterclaim ¶ 10, more than three years before Counter-

---

[7] Colella disputes the Counterclaim's allegation that Androus made the transfers "with the assistance and knowledge of Colella," Counterclaim ¶ 10, and therefore denies that he ever represented Androus in relation to the transfers, Mem. at 18; but this sort of factual dispute is of course irrelevant to the Court's evaluation of the instant motion to dismiss.

Plaintiffs counterclaimed on February 24, 2021.  Mem. at 18–19.  "[A] defendant is entitled to succeed on a Rule 12(b)(6) motion to dismiss brought on statutes of limitations grounds only if the facts that give rise to this affirmative defense are clear on the face of the plaintiff's complaint."  *Hagan v. United States*, 197 F. Supp. 3d 30, 35 (D.D.C. 2016) (cleaned up).

Under D.C.'s discovery rule, the statute of limitations on a legal malpractice claim begins to run when the plaintiff has knowledge of some injury caused by the defendant's wrongdoing.  *See Knight v. Furlow*, 553 A.2d 1232, 1233–34 (D.C. 1989).  There is nothing in the Counterclaim to suggest that Counter-Plaintiffs learned or should have learned that Colella had failed to advise them of a potential fraudulent transfer problem or that the transfers would injure them in any way until July 19, 2018, when Thomas filed his fraudulent transfer suit.  Counterclaim ¶ 12.  Assuming the statute began to run that day, Counter-Plaintiffs' February 24, 2021 claim is timely.  For this reason alone, Colella's statute-of-limitations argument cannot prevail at the motion-to-dismiss stage.  *Cf. Seed Co.*, 840 F. Supp. 2d at 123 ("[T]he point in time at which the plaintiff knew or reasonably should have known is normally a question of fact for a jury, and a trial judge should only make this determination as a matter of law if no reasonable person could disagree on this date.").

Even assuming for the sake of argument that Counter-Plaintiffs discovered an injury on October 24, 2017 (the day of the transfers), the continuous representation rule would save their Counterclaim from a Rule 12(b)(6) dismissal on statute-of-limitations grounds.  The District of Columbia's "continuous representation rule . . . tolls the statute of limitations on legal malpractice claims until the attorney's representation concerning the particular matter in issue is terminated—even if the client was on actual or inquiry notice of the attorney's malpractice before then."  *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 68 (D.D.C. 2015) (cleaned

up), *aff'd*, No. 15-7053, 2016 WL 11761481 (D.C. Cir. Mar. 30, 2016). "Under D.C. law . . . what constitutes the particular matter in issue and when that matter was terminated are questions of fact about which there is little guidance." *Id.* (cleaned up). Colella's statute-of-limitations defense depends upon the answer to a factual question about the extent of the transfer representation that is inappropriate for resolution at the motion-to-dismiss stage. Colella's alleged transfer representation arguably lasted at least until some time after the July 19, 2018 filing of Thomas's complaint, when Androus asked Colella a legal question about the transfers: whether he should reverse them by deeding the Alexandria Property back to 2208 Russell Road, LLC as a way of mooting Thomas's fraudulent transfer complaint. Counterclaim ¶ 13. Colella advised Androus not to do this. *Id.* If the representation did last this long, Counter-Plaintiffs' claim would be timely.

Colella stresses that the August 2, 2017 engagement agreement "was for representation in a dispute between Counter-Plaintiffs" and Thomas, Counterclaim ¶ 6, and it is true that Androus's July 2018 question about reversing the conveyances arguably related as much to the litigation as it did to advice on the transfers in the first instance. But nothing in the record at this stage precludes the possibility that there was a distinct representation related to the transfers or that the transfer advice was part of pre-litigation strategy covered by the August 2, 2017 engagement letter. More evidence is required to tease out the precise nature of any representation related to the transfers, whether such a representation was distinct from the litigation representation, and whether the July 2018 question about reversing the transfers constituted a continuation of either or both of these representations. *Cf. Rocha*, 101 F. Supp. 3d at 69 (resolving a continuous representation question by looking to a summary judgment record which included the engagement agreement and the plaintiff's deposition testimony about her

understanding of the scope of the relevant engagement).  The existence of these open questions defeats Colella's statute of limitations argument insofar as he presents it in support of the instant motion to dismiss.

*In pari delicto.*  Colella next invokes the doctrine of *in pari delicto*, "an affirmative defense that precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing."  *In re Derivium Cap. LLC*, 716 F.3d 355, 367 (4th Cir. 2013).  Colella seems to acknowledge that the fact-intensive defense of *in pari delicto* is suitable for resolution at the pleading stage, if at all, only when there is "no set of facts under which [Counter-Plaintiffs] would not be subject to the defense."  *In re Greater Se. Cmty. Hosp. Corp. I*, 353 B.R. 324, 369 (Bankr. D.D.C. 2006); *Yarn v. Hamburger L. Firm, LLC*, No. CIV.A. 12-3096, 2013 WL 5375462, at *10 (D. Md. Sept. 24, 2013); *see* Mem. at 16–17.  This case does not meet that high bar.

Colella's argument that "Androus bears equal or greater fault [as compared with Colella] in the fraudulent transfers at issue," rests on two faulty premises: that the record conclusively establishes that Androus acted fraudulently with respect to the transfers and that the record conclusively establishes that Colella engaged in "no wrongdoing . . . in connection with" the transfers.[8]  Mem. at 16–17.  For the first premise, Colella points out that "Androus admitted under oath" in the Virginia trial "that it was his intention to make the transfers, and that he did transfer the property"; Colella says that it is therefore "clear" that Androus's "intention [was] to make the conveyances."  *Id.* at 16.  But establishing that Androus intended to make the transfers does not establish that he did so *fraudulently*, that is, "with intent to delay, hinder, or defraud

---

[8] The Court does not suggest that establishment of these premises would make application of the *in pari delicto* doctrine appropriate in this case.  Rather, it declines to reach that issue because it does not need to at this stage.

creditors." Va. Code Ann. § 55.1-400.  In fact, in the very testimony Colella cites, Androus identifies an alternative reason behind his conveyances: an estate planning strategy.  Mot. Dismiss Ex. E at 418–19, ECF No. 28-6.  So Colella fails to conclusively establish the first premise, that Androus in fact acted fraudulently.

Same for the second premise, for which Colella relies on a Virginia court order denying Thomas's motion to compel production of certain communications between Androus and Colella.  Colella insists that this one-sentence order constitutes a finding that that there was "no evidence of wrongdoing by [Androus's] Counsel," Mem. at 17, but this misreads the Virginia litigation record.  Androus and Colella had invoked attorney-client privilege over the communications; in response, Thomas moved to compel based on his assertion that the documents were subject to the crime-fraud exception to the attorney-client privilege.  Thomas argued to the Virginia court that the application of the crime-fraud exception turned on the client's fraudulent intent alone, and that, therefore, the "attorney's knowledge of the client's wrongful intent is irrelevant."  Mot. Dismiss Ex. F at 5–7, ECF No. 28-7 (citing *Clark v. United States*, 289 U.S. 1, 15 (1933)).  Thus, Thomas premised his argument entirely on the assertion that Androus had acted with fraudulent intent, *id.* at 7–8—the Virginia Court could have resolved the motion without even considering whether Colella did or did not engage in any wrongdoing.  Moreover, the Virginia court denied the motion to compel for another reason altogether, "its finding that such documents are not relevant to any material issue [in this] matter[.]"  Mot. Dismiss Ex. G at 2, ECF No. 28-8.  The Virginia court's motion-to-compel ruling therefore tells us nothing about Colella's (or Androus's) level of wrongdoing in relation to the property transfers.  Based on the motion-to-dismiss record and the arguments Colella has presented, Colella's *in pari delicto* argument does not add up.

*Judicial estoppel.*   Colella claims that Androus's assertion that he transferred the
Alexandria Property between his LLCs "with the assistance and knowledge of Colella and his
then law firm, Duane Morris," Counterclaim ¶ 10, is barred by the equitable doctrine of judicial
estoppel.  Mem. at 19–20.   The Court is not persuaded.  "Judicial estoppel generally prevents a
party from prevailing in one phase of a case on an argument and then relying on a contradictory
argument to prevail in another phase."  *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro,
LLP*, 905 F. Supp. 2d 150, 154 (D.D.C. 2012) (cleaned up).  Three considerations guide a court's
exercise of discretion in determining whether to apply judicial estoppel.

> (1) Is a party's later position clearly inconsistent with its earlier position?  (2) Has
> the party succeeded in persuading a court to accept that party's earlier position, so
> that judicial acceptance of an inconsistent position in a later proceeding would
> create the perception that either the first or the second court was misled? (3) Will
> the party seeking to assert an inconsistent position derive an unfair advantage or
> impose an unfair detriment on the opposing party if not estopped?

*Id.* (cleaned up); *see also Dennis v. Jackson*, 258 A.3d 860, 865–66 (D.C. 2021) (describing
these considerations as "basic elements that must be established in order to apply judicial
estoppel.").

Colella again points to Androus's testimony at the Virginia trial, during which he
admitted that he made the transfers as part of an estate planning scheme.  "At no time" during
this testimony, Colella stresses, "did Androus claim that the transfers were, in fact, made upon
the advice or assistance of Counsel."  Mem. at 19–20.  But Colella does not identify any instance
in which Androus affirmatively stated that he did *not* receive counsel's advice on the transfers.
Therefore, Androus's trial testimony is not "clearly inconsistent" with his current position that
Colella advised him with respect to the transfers; it is irrelevant to this position.  *Encyclopaedia
Britannica*,  905 F. Supp. 2d at 154.  And even if Androus's trial position that the transfers were
not fraudulent were somehow inconsistent with the current allegation that Colella advised him on

the transfers, it is far from clear that he persuaded the Virginia court to accept any of his assertions regarding the transfers.  *See id.*  Though the basis of the Virginia jury's verdict against Counter-Plaintiffs is not evident from the Counterclaim or the Virginia-court attachments, it very well may have rested on a rejection of Androus's assertions regarding the transfers.  *See* Counterclaim ¶¶ 16, 30.

Colella also tries once again to rely on the Virginia-court order denying Thomas's motion to compel, but again to no avail.  Colella says that the order represents the Virginia court's conclusion that Colella did not advise on the transfers.  Mem. at 20; Reply at 9.  But this misunderstands the Virginia court's order: as the Court has explained, all the Virginia court held was that the documents Thomas sought were not relevant to the litigation.  The dispute did not present the issue of whether Colella had provided advice on the transfer transaction, and the order said nothing about the issue.  Even if it had, there is nothing in the current record to support a conclusion that the court's conclusion adopted any assertions from *Androus*; Colella has provided only *Thomas's* brief in support of the motion to compel.  Therefore, Colella's judicial estoppel argument fails at the motion-to-dismiss stage.

### B.  The Counterclaim States a Legal Malpractice Claim Against Zefutie

Equipped with its conclusion that the allegations in the Counterclaim plausibly support Counter-Plaintiffs' legal malpractice claim against Colella in several ways, the Court turns to addressing Counter-Defendants' argument that the Counterclaim does not state a legal malpractice claim against Zefutie.  *See* Reply at 4–5.  To the contrary, the Counterclaim plausibly alleges that Zefutie, Colella's co-counsel and law partner, was directly involved in several of the alleged breaches of the duty of care the Court has concluded are sufficient to state a legal malpractice claim.  Counter-Plaintiffs allege that Zefutie "assisted Colella with the preparation for and conduct of the trial of the" Virginia litigation; that he consented to the

manner in which Androus prepared a report on behalf of his expert witness Resetco; that he (along with Colella) heard and rejected Androus's repeated requests to pursue settlement or mediation because he insisted that Androus had "very substantial claims and a very good chance to win at trial"; that he tried and failed to get Harding's interior repairs estimate admitted into evidence at trial; and that "Colella and/or Zefutie failed to alert Harding to the fact that Androus had revised Harding's estimate downward."  Counterclaim ¶¶ 20, 23, 24, 25, 28; Mot. Dismiss. Ex. I at 39–40.  Thus, the Counterclaim alleges Zefutie's direct involvement in much of the conduct at the core of Counter-Plaintiffs' claims, most notably the alleged failure to prepare Harding for his deposition, the resultant failure to offer his estimate into evidence, and the refusal to agree to Androus's wish to explore settlement.  For the same reasons that these alleged failures suffice to state a legal malpractice claim against Colella, they suffice to state a legal malpractice claim against Zefutie.

## IV.  CONCLUSION

For the foregoing reasons, Counter-Defendants' Motion to Dismiss Counter-Plaintiffs' Counterclaim (ECF No. 28) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  03/25/2022                                          RUDOLPH CONTRERAS
                                                            United States District Judge