**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UGO COLELLA, *et al.*, | : | | |
| | : | | |
| Plaintiffs and Counter-Defendants, | : | Civil Action No.: | 20-813 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 49, 54, 58, 70 |
| | : | | |
| THOMAS T. ANDROUS, *et al.*, | : | | |
| | : | | |
| Defendants and Counter-Plaintiffs. | : | | |

<u>**MEMORANDUM OPINION**</u>

**Denying Plaintiffs'/Counter-Defendants' Motion to Dismiss; Denying Plaintiffs'/Counter-Defendants' Motion for Sanctions; Granting in Part and Denying in Part Plaintiffs'/Counter-Defendants' Motion to Compel Discovery; Denying Plaintiffs'/Counter-Defendants' Supplemental Motion to Compel Production of Documents**

## I. INTRODUCTION

This opinion addresses a litany of motions filed by Plaintiffs/Counter-Defendants Ugo Colella and John J. Zefutie, Jr. ("Counter-Defendants") in the course of ongoing litigation between Counter-Defendants and Defendants/Counter-Plaintiffs Thomas T. Androus, 2208 Russell Road LLC, and 2208 RR AVA, LLC ("Androus"[1] or "Counter-Plaintiffs"). Specifically, Counter-Defendants move to dismiss Counter-Plaintiffs' legal malpractice counterclaim for lack of standing, move for sanctions pursuant to Rule 11, and move to compel discovery of certain documents which Counter-Plaintiffs contend are attorney-client privileged or shielded by the attorney work product doctrine. For the reasons discussed below, Counter-Defendants' motion to dismiss is denied, their motion for sanctions is denied, their motion to compel discovery is

---

[1] For simplicity, the Court at times refers to Counter-Plaintiffs as "Androus" in light of the fact that Androus is the "sole and controlling member" of the named LLC defendants. *See Colella v. Androus*, No. 20-cv-813, 2022 WL 888182, at *1 (D.D.C. Mar. 25, 2022).

granted in part and denied in part, and their supplemental motion to compel production of documents is denied.

## II.  BACKGROUND

This case initially involved only a dispute over legal fees, *see Colella v. Androus* ("*Colella I*"), 518 F. Supp. 3d 439, 442–44 (D.D.C. 2021) (detailing the backdrop of the legal fee dispute), but has since morphed (by counterclaim) to include a legal malpractice claim as well, *Colella v. Androus* ("*Colella II*"), No. 20-cv-813, 2022 WL 888182, at *1–3 (D.D.C. Mar. 25, 2022) (describing the foundation of the legal malpractice claim).  Because the Court has previously described the factual and procedural background of both the legal fee dispute and the malpractice claim, it will not set forth a detailed rendition of the same here.  Instead, it will provide only a brief summary of the relevant facts and the procedural developments that have taken place since its earlier opinions.  Additionally, the Court will provide further, relevant factual context in the sections of the opinion discussing the discrete motions at issue.

As the Court has previously explained, Counter-Defendants "Ugo Colella and John Zefutie represented [Counter-Plaintiffs] Thomas Androus and two limited liability companies of which Androus was the sole and controlling member—2208 Russell Road, LLC and 2208 RR AVA, LLC—in a lawsuit against a construction contractor in Virginia state court."  *Colella II*, 2022 WL 888182, at *1.  The case went to trial, the result of which was a $2.4 million jury verdict against Androus and his LLCs.  *Id.* at *3.  Androus—represented by new counsel— unsuccessfully appealed the jury verdict.  *See id.*

Following the trial in Virginia, Androus's trial counsel—Colella and Zefutie—filed an action in this court to recover their unpaid "fees and litigation expenses."  *Colella I*, 518 F. Supp. 3d at 443; *see also* Compl., ECF No. 1.  In response, Counter-Plaintiffs filed a counterclaim

alleging that Counter-Defendants had committed legal malpractice.  *See Colella II*, 2022 WL 888182, at *3; *see also* Countercl., ECF No. 26.  The counterclaim sought to recover "damages in the form of the adverse trial judgment," which, after post-judgment interest amounted to approximately $2,600,000; "'overpayment' of $300,000 in attorneys' fees for subpar services; appellate fees to remedy the trial judgment; and the cost of the required bond pending appeal." *See Colella II*, 2022 WL 888182, at *3 (cleaned up).  Counter-Defendants subsequently filed a motion to dismiss, arguing that the counterclaim failed to state a claim upon which relief could be granted and that Counter-Plaintiffs' claims were barred by the statute of limitations, the doctrine of *in pari delicto*, and judicial estoppel.  *See id.* at *4.  The Court disagreed and, accordingly, denied the motion.  *See id.* at *13.  The parties then engaged in extended fact and expert discovery.

Following the close of discovery, Counter-Defendants filed another motion to dismiss. *See generally* Pls.'/Counter-Defs.' Mem. Supp. Mot. Dismiss ("Counter-Defs.' Mot. to Dismiss"), ECF No. 58-1.  Generally speaking, the motion argues that Counter-Plaintiffs lack standing to bring a counterclaim for malpractice because they have failed to produce evidence showing that they suffered an injury as a result of Counter-Defendants' alleged professional negligence.  *See id.* at 1–4.  The motion therefore argues that the Court lacks subject matter jurisdiction to hear the claim.  *See id.* at 4.  The motion is fully briefed.  *See* Defs.'/Counter-Pls.' Mem. P. & A. Opp'n Mot. Dismiss ("Counter-Pls.' Opp'n Mot. to Dismiss"), ECF No. 67; Pls.'/Counter-Defs.' Reply Mem. Supp. Mot. Dismiss ("Counter-Defs.' Reply Mot. to Dismiss"), ECF No. 69.

Not content to file just one motion seeking dismissal of the counterclaim, Counter-Defendants also filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11.  *See*

*generally* Pls.'/Counter-Defs.' Mem. P. & A. Supp. Mot. Sanctions ("Counter-Defs.' Rule 11

Mot."), ECF No. 70-1.  In that motion, Counter-Defendants allege that discovery has revealed

that the counterclaim is so devoid of a legal and factual foundation that it should never have been

brought in the first place.  *See id.* at 1–2.  Thus, they argue that "dismissal of the Counterclaim"

is warranted as a sanction.  *See id.* at 39.  That motion, too, is fully briefed and ripe for decision.

*See* Defs.'/Counter-Pls.' Mem. P. & A. Opp'n Mot. Sanctions ("Counter-Pls.' Opp'n Rule 11

Mot."), ECF No. 72; Pls.'/Counter-Defs.' Reply Mem. P. & A. Supp. Mot. Sanctions ("Counter-

Defs.' Reply Rule 11 Mot."), ECF No. 73.

Finally, Counter-Defendants have moved to compel production of certain records that

Counter-Plaintiffs contend are protected by the attorney-client privilege or attorney work product

doctrine.  *See* Pls.'/Counter-Defs.' Mem. P. & A. Supp. Pls.'/Counter-Defs.' Mot. Compel

Discovery ("Counter-Defs.' Mot. Compel"), ECF No. 49-1; *see also* Pls.'/Counter-Defs.' Suppl.

Mem. P. & A. Supp. Pls.'/Counter-Defs.' Mot. Compel ("Counter-Defs.' Suppl. Mot. Compel"),

ECF No. 54.  The Court has held multiple hearings on this issue, and the parties have narrowed

the universe of contested documents.  To resolve the parties' dispute regarding the remaining

documents, the Court determined that it is necessary to conduct an *in camera* inspection of the

challenged records.

### III.  ANALYSIS

### A.  Motion to Dismiss for Lack of Standing

Pursuant to Federal Rule of Civil Procedure 12(b)(1), Counter-Defendants first move to

dismiss the counterclaim for lack of subject matter jurisdiction on the ground that Counter-

Plaintiffs lack standing.  At a high level of generality, Counter-Defendants argue that neither

Androus nor the named LLCs can show that they suffered an injury in fact as a result of Counter-

Defendants' alleged malpractice because neither Androus nor the named LLCs have produced evidence showing that *they, themselves* paid any portion of the adverse jury award, the attorneys' fees owed to Counter-Defendants' or their former law firm, the attorneys' fees owed to appellate counsel, or the appeal bond.  *See* Counter-Defs.' Mot. to Dismiss at 11–16.

For their part, Counter-Plaintiffs contend that it does not matter whether Androus, the named LLCs, or a third-party paid those sums.  *See* Counter-Pls.' Opp'n Mot. to Dismiss at 2. To put this argument into context, it is helpful to note that—in addition to the two LLCs named in the present suit—Androus owns, operates, and is the sole member of at least fifteen other limited liability companies.  *See* Ex. A, Counter-Pls.' Opp'n Mot. to Dismiss at 5, ECF No. 67-1; *see also* Counter-Pls.' Opp'n Mot. to Dismiss at 9 n.7.  Two of those other limited liability companies are Larnaca Company, LLC and Larnaca Properties, LLC (collectively, the "Larnaca LLCs").  *See* Counter-Pls.' Opp'n Mot. to Dismiss at 9 n.7; *see also* Decl. of Thomas T. Androus ("Androus Decl.") at 4, ECF No. 57.  And there is evidence in the record that suggests that Androus used money from at least one of the Larnaca LLCs to pay for things such as Counter-Defendants' legal fees.  *See, e.g.*, Androus Decl. at 4.  In light of that context, Androus argues that, for purposes of standing, it is immaterial whether he, himself paid the amounts he seeks as damages or whether he "had one or more of his single-member LLCs pay some or all" of the amounts owed.  *See* Counter-Pls.' Opp'n Mot. to Dismiss at 2, 4–9.

### 1.  Legal Standard

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Federal law empowers federal district courts to hear only certain kinds of cases, and it is "presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

375, 377 (1994).  A court that lacks jurisdiction must dismiss the action.  Fed. R. Civ. P.

12(b)(1), 12(h)(3).

When deciding a Rule 12(b)(1) motion, the court generally must "assume the truth of all

material factual allegations in the complaint and construe the complaint liberally, granting

plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such

facts determine [the] jurisdictional questions."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139

(D.C. Cir. 2011) (internal quotation marks omitted).  However, when (as here) a defendant

challenges the "factual basis" of the court's subject matter jurisdiction, "the court may not deny

the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and

disputed by the defendant."  *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (citation

omitted).  Instead, the court "must go beyond the pleadings and resolve any disputed issue of

fact . . . necessary to a ruling upon the motion to dismiss."  *Id.* (quoting *Phoenix Consulting v.

Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)); *see also Herbert v. Nat'l Acad. of Scis.*,

974 F.2d 192, 197 (D.C. Cir. 1992); *Saline Parents v. Garland*, 630 F. Supp. 3d 201, 205

(D.D.C. 2022).

## 2.  Standing

Article III of the Constitution limits the "judicial Power" of federal courts to "Cases" and

"Controversies."  U.S. Const. art. III, § 2, cl. 1.  "[T]here is no justiciable case or controversy

unless the plaintiff has standing."  *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017).  As the

Supreme Court has interpreted this requirement, "the irreducible constitutional minimum of

standing contains three elements": (1) the plaintiff must have suffered an "injury in fact" that is

"concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there

must exist "a causal connection between the injury and the conduct complained of"; and (3) it

must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).  "The burden of establishing these elements falls on the party invoking federal jurisdiction." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).  That said, the means by which a plaintiff may carry that burden "varies" depending on the stage of the litigation.  *Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*, 839 F. Supp. 2d 40, 46 (D.D.C. 2012); *see Lujan*, 504 U.S. at 561.  At the pleading stage, the plaintiff need only "allege facts demonstrating [that] each element" is met.  *Friends of Animals*, 828 F.3d at 992; *see also Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . .").  In contrast, at the summary judgment stage, "the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of . . . summary judgment . . . will be taken to be true."  *Lujan*, 504 U.S. at 561 (cleaned up).

Here, Counter-Defendants contend that, in light of the evidence revealed through discovery, Counter-Plaintiffs have failed to establish that they suffered any injury as a result of Counter-Defendants' alleged malpractice.  The thrust of Counter-Defendants' argument is that, because Androus has not provided any evidence to show that *he, himself* paid the adverse judgment, the attorneys' fees, or the cost of the appeal bond, neither Androus nor the named-LLCs may claim they suffered an injury in fact.  *See* Counter-Defs.' Mot. to Dismiss at 13 (arguing that "Androus [has not] produced any documents that would prove that he actually personally 'paid,' *and therefore incurred*" legal fees, the cost of the appeal bond or the cost of the adverse judgment); Counter-Defs.' Reply Mot. to Dismiss at 2 ("Androus does not dispute, and therefore confirms, that neither he nor [the named LLCs] paid a penny out of pocket for any

of the damages they seek in this case.  Because Androus's Counterclaim only seeks money

damages as reimbursement for alleged out-of-pocket losses, and because Androus incurred no

such losses, he has no standing to claim damages which is an essential element of his legal

malpractice Counterclaim." (citations omitted)).  In other words, Counter-Defendants argue that,

because there is no evidence that Androus *personally* paid any of those categories of debts, there

is no evidence that Counter-Plaintiffs incurred or suffered any damages.[2]

　　　　Counter-Plaintiffs respond by invoking the so-called "collateral source rule."  The

collateral source rule provides that "an injured person may usually recover in full from a

wrongdoer regardless of anything he may get from a collateral source unconnected with the

wrongdoer."  *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 65 (D.C. Cir.

2019) (per curiam) (quoting *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976) (per

curiam)); *see also Jacobs v. H. L. Rust Co.*, 353 A.2d 6, 7 (D.C. 1976) ("The collateral source

rule provides that when a tort plaintiff's items of damage are reimbursed by a third party who is

independent of the wrongdoer, the plaintiff may still seek full compensation from the tortfeasor

even though the effect may be a double recovery.").[3]  The purpose underlying the rule is to

---

[2] Both parties frequently conflate the concept of damages—a necessary element of a legal malpractice cause of action, *see, e.g.*, *Martin v. Ross*, 6 A.3d 860, 862 (D.C. 2010)—and Article III injury.  Although there is often "overlap" between the two concepts, "they are not one and the same."  *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019).

[3] The parties still have not briefed the question of whether District of Columbia or Virginia law governs the malpractice claim.  *See Colella II*, 2022 WL 888182, at *4 n.1 (explaining that the parties retain responsibility for briefing any choice-of-law issues).  They agree, however, that the Court need not conclusively determine whether D.C. or Virginia law governs the substantive tort claim for purposes of resolving the motion to dismiss.  *See* Counter-Defs.' Mot. to Dismiss at 12 n.5 ("[T]here is no choice-of-law issue in connection with this Rule 12(b)(1) motion because damage is an essential element of a legal malpractice claim whether brought under District of Columbia or Virginia law."); Counter-Pls.' Opp'n Mot. to Dismiss at 5 ("The result is the same, irrespective of whether the substantive law of Virginia or the District of Columbia ultimately applies.").

"prevent[] the victim's benefits from becoming the tortfeasor's windfall." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d at 65; *see also Atlanta Channel, Inc. v. Solomon*, 583 F. Supp. 3d 174, 214 (D.D.C. 2022) ("The rule seeks to avoid providing the defendant a 'windfall' by permitting him, through no action of his own, to avoid paying the full extent of damages he caused."). Applied here, Counter-Plaintiffs' argument goes, the rule would permit them to recover as damages the costs they incurred as a result of Counter-Defendants' malpractice, regardless of whether those costs were ultimately paid by Androus, the named-LLCs, or a third party (namely, the Larnaca LLCs). *See* Counter-Pls.' Opp'n Mot. to Dismiss at 5–9.

Counter-Plaintiff's position draws support from the Fifth Circuit's decision in *Rideau v. Keller Independent School District*, 819 F.3d 155 (5th Cir. 2016). In *Rideau*, the plaintiffs brought claims on behalf of their child, who had been abused by his special education teacher. *Id.* at 157–58. Among other things, the plaintiffs sought to recover "past medical expenses and . . . future home care expenses." *Id.* at 161. Relevantly, the school district argued that the plaintiffs lacked standing to seek such damages because neither the parents nor the child had paid or would pay those expenses. *See id.* Instead, the "expenses ha[d] been and w[ould] be paid out of" a trust established in the child's name. *Id.*

The Fifth Circuit had no trouble concluding that, despite the fact that the trust had paid the expenses at issue, the plaintiffs had standing to recover both past and future medical expenses. *See id.* As to the past expenses, the court explained that, because the parents (not the trust) were "legally responsible" for their child's medical expenses, they had suffered "an economic injury for Article III standing purposes." *Id.* As for future medical expenses, the court held that the child had standing to recover for "economic harm" occurring later in life that stemmed from his injuries. *Id.* For both categories of economic injuries, the court explained that

"the existence of a potential third-party payor in the form of the [t]rust" does not "deprive" the plaintiffs of "standing that would otherwise exist as a result of incurring" the financial obligations. *See id.*; *see also id.* at 162 ("For purposes of establishing an Article III injury, the existence of the trust should not create any more of an impediment than the existence of insurance.").

It is easy to see the parallels between *Rideau* and this case. Here, as in *Rideau*, Androus has provided evidence showing that he incurred large financial obligations as a result of Counter-Defendants' alleged malpractice. For example, the record demonstrates—and Counter-Defendants do not dispute—that a Virginia jury rendered a multi-million-dollar verdict against Androus and the named LLCs. *See generally* Ex. 1, Counter-Defs.' Rule 11 Mot., ECF No. 70-3. The record also contains evidence tending to suggest that that judgment has been "fully satisfied."[4] *See* Ex. A, Mot. for Leave to File Suppl. Decl., Suppl. Decl. of Thomas T. Androus ("Suppl. Androus Decl.") at 1–2, ECF No. 61. Although the record does not contain evidence conclusively establishing how the judgment was paid or the individual or entity that paid it, there is at least some evidence that the judgment was paid by one of the Larnaca LLCs. *See id.* As *Rideau* aptly illustrates, that fact does not deprive Androus—as the person legally obligated to pay the judgment—of Article III standing. *See Rideau*, 819 F.3d at 161 ("[T]he existence of a potential third-party payor . . . does not deprive the [plaintiffs] of standing that would otherwise exist as a result of incurring that obligation."); *see also Tamposi v. Denby*, 136 F. Supp. 3d 77,

---

[4] Androus's declaration states that he "produced a Certificate of Satisfaction showing that the judgment entered against '2208 Russell Road, LLC, Thomas T. Androus a/k/a Theo Androus and 2208 RR AVA, LLC' in the amount of $2,676,757.37 was 'fully paid and discharged,'" *see* Ex. A, Mot. for Leave to File Suppl. Decl., Suppl. Decl. of Thomas T. Androus ("Suppl. Androus Decl.") at 1, ECF No. 61, but the Certificate of Satisfaction is not, itself, in the record before the Court. That said, Counter-Defendants do not appear to contest the existence or substance of the Certificate.

119–20 (D. Mass. 2015) (holding that plaintiff had standing to bring legal malpractice claim despite the fact that "her legal-malpractice insurance and her law firms . . . combined to cover all of the fees and settlement costs for which she seeks reimbursement").

Separately, Counter-Defendants themselves acknowledge that, in 2019, Culhane Meadows (the law firm at which they were previously employed as partners) received $267,750 in connection with their representation of Androus and the named LLCs.  *See* Ex. A, Counter-Defs.' Mot. to Dismiss at ¶ 6, ECF No. 58-2.  To be sure, the evidence tends to show the payments to Culhane Meadows came from one of the Larnaca LLCs.  *See* Exs. 4, 5, Decl. of Ugo Colella, ECF Nos. 58-6, 58-7.  But again, that does not deprive Androus—as the person legally responsible for paying those fees—of Article III standing.  *See Rideau*, 819 F.3d at 161; *cf. also Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C. 1989) ("We conclude that attorney's fees and costs expended as a result of an attorney's alleged malpractice constitute legally cognizable damages for purposes of stating a claim for such malpractice.").

For purposes of resolving the instant motion, these findings are sufficient to conclude that Counter-Plaintiffs have, at this stage, put forth sufficient evidence of monetary injury to pursue their malpractice claim.  After all, "[e]conomic harm . . . clearly constitutes an injury-in-fact." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).  And even just "[a] dollar of economic harm is still an injury-in-fact for standing purposes."  *Id.*  Because there is evidence in the record from which a reasonable jury could conclude that Counter-Defendants' alleged malpractice resulted in at least a dollar of economic injury to Androus, Counter-Defendants' motion to dismiss for lack of standing is denied.

### B.  Motion for Rule 11 Sanctions

As an "alternative" to their motion to dismiss, Counter-Defendants have filed a motion for sanctions under Rule 11.  *See* Counter-Defs.' Rule 11 Mot. at 3 n.3.  Counter-Defendants contend that the counterclaim is "frivolous" and that discovery has revealed that it has been so from the start.  *See id.* at 1.  Accordingly, they seek dismissal of the counterclaim and any other "sanctions that the Court deems just and appropriate."  *Id.* at 39.  The motion is denied.

Federal Rule of Civil Procedure 11(b) provides, in relevant part, that by presenting a pleading, written motion, or other paper to the court, "an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after" a reasonable inquiry:

> (1) [the pleading, motion, or other paper] is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).  If the court determines that any portion of that rule has been violated, Rule 11(c) states that "the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. P. 11(c).  Rule 11 is thus "designed to ensure that allegations made in filings are supported by a sufficient factual predicate at the time that the claims are asserted."  *Jordan v. U.S. Dep't of Lab.*, 273 F. Supp. 3d 214, 240–41 (D.D.C. 2017) (internal quotation marks omitted).  In that sense, the rule is a means of "protect[ing] the court from frivolous and baseless filings that are not well grounded, legally

untenable, or brought with the purpose of vexatiously multiplying the proceedings." *Cobell v. Norton*, 211 F.R.D. 7, 10 (D.D.C. 2002) (quoting *Cobell v. Norton*, 157 F. Supp. 2d 82, 86 n.8 (D.D.C. 2001)).

"Courts do not impose Rule 11 sanctions lightly; such sanctions are an extreme punishment for filing pleadings that frustrate judicial proceedings." *Jordan*, 273 F. Supp. 3d at 241  In determining whether to issue sanctions, courts consider "(1) whether each presenting attorney 'conducted a reasonable inquiry,' (2) whether each presenting attorney 'determined that [the] papers filed with the court are well grounded in fact [and] legally tenable,' and (3) whether the papers were 'interposed for any improper purpose.'" *Id.* (alterations in original) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)).  Rule 11 gives the court "discretion to decide [both] whether a . . . violation has occurred and what sanctions should be imposed if there has been [a] violation." *Nat'l Cas. Ins. Co. v. Solomon*, 502 F. Supp. 3d 401, 410 (D.D.C. 2020) (quoting *Long v. Dep't of Just.*, 207 F.R.D. 4, 6 (D.D.C. 2002)).  Although "[d]ismissal is a legitimate sanction under Rule 11," it is typically only appropriate in the face of "serious misconduct when lesser sanctions would be ineffective or are unavailable." *Marina Mgmt. Servs., Inc. v. Vessel My Girls*, 202 F.3d 315, 325 (D.C. Cir. 2000); *Liggon-Redding v. Est. of Sugarman*, 659 F.3d 258, 263 (3d Cir. 2011) ("Dismissing an action under Rule 11 . . . is a sanction of last resort.").

As many courts previously have admonished, "a Rule 11 motion is not a proper substitute for a dispositive motion." *Betz v. Glob. Telesourcing, LLC*, No. 21-cv-1320, 2021 WL 5865384, at *4 (D.D.C. Dec. 10, 2021) (internal quotation marks omitted); *see also Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 495 F. Supp. 3d 47, 50–51 (D. Mass. 2020) (collecting cases); *James v. Caterpillar, Inc.*, 824 F. App'x 374, 378 (6th Cir. 2020) ("[I]n general, motions for

sanctions should not substitute for motions to dismiss or motions for summary judgment, which test the sufficiency of the complaint's allegations.").  Despite that admonishment, Counter-Defendants' Rule 11 motion is essentially a motion for summary judgment.  The first part of the motion argues that the counterclaim fails because there is no evidence that Counter-Defendants' alleged malpractice "proximately caused Androus to suffer damage," *see* Counter-Defs.' Rule 11 Mot. at 13–16, while the rest of the motion contends that there is no evidence showing that Counter-Defendants "breached the standard of care," *see id.* at 17–38; *see also Crawford v. Katz*, 32 A.3d 418, 427 (D.C. 2011) (explaining that, among other things, a claim of legal malpractice requires the plaintiff to show a "breach of the [applicable] standard of care" and "a causal relationship between the violation and the harm complained of" (internal quotation marks omitted)); *Williams v. Joynes*, 677 S.E.2d 261, 264 (Va. 2009) (similar under Virginia law). Throughout, Counter-Defendants cite evidence—and draw a litany of inferences therefrom— which, they argue, shows beyond a shadow of a doubt that the counterclaims are legally and factually vacuous.

The Court is not convinced.  For the most part, Counter-Defendants' motion—especially when coupled with Counter-Plaintiffs' response thereto—simply illuminates areas in which the parties disagree on the strength of specific evidence, the inferences to be drawn from information produced or revealed during discovery, and the application of the law to various facts.  That being so, the "better course" at this stage is for Counter-Defendants to raise their challenges to the legal and factual sufficiency of the counterclaim through the more "traditional device" of a motion for summary judgment, not a motion for Rule 11 sanctions.  *See Betz*, 2021 WL 5865384, at *4.  Of course, it may ultimately be the case that, as Counter-Defendants contend, the counterclaim is so lacking in factual and legal support that it should never have been brought in

the first place.  But to the extent that is so, Counter-Defendants may file a renewed motion for

sanctions at a later point in time.  *See id.* (explaining that when a "defendant contends 'that

institution of the case itself was improper,' '[c]ourts should, and often do, defer consideration

of . . . sanctions motions until the end of trial'" (quoting *Lichtenstein v. Consol. Servs. Grp., Inc.*,

173 F.3d 17, 23 (1st Cir. 1999))); *see also* 5A Charles Alan Wright, Arthur R. Miller & A.

Benjamin Spencer, Federal Practice and Procedure § 1337.1 (4th ed. 2021) ("[I]f the challenged

conduct is that there is no factual support for the institution of the action itself . . . , the question

of whether there has been a Rule 11 violation generally should not be decided until after the

litigation is completed."); *id.* at n.22 (collecting cases).  For now, however, Counter-Defendants'

motion for Rule 11 sanctions is denied.

### C.  Motions to Compel Discovery

Finally, the Court turns to Counter-Defendants motions to compel.  *See* Counter-Defs.'

Mot. Compel, ECF No. 49-1; Counter-Defs.' Suppl. Mot. Compel, ECF No. 54.  Initially,

Counter-Defendants argued that Counter-Plaintiffs' privilege logs inadequately described the

basis on which Counter-Plaintiffs sought to withhold over five hundred documents on the

grounds of the attorney-client privilege or the attorney work product doctrine.  *See* Counter-

Defs.' Mot. Compel at 3–4.  They further argued that some documents listed on the privilege

logs were "[c]learly [d]iscoverable" because Counter-Plaintiffs had "implied[ly] waive[d]" the

attorney-client privilege by bringing their malpractice action.  *See id.* at 4–5.  Counter-Plaintiffs

originally retorted that their privilege logs were adequately descriptive and that none of the

documents listed within the logs was discoverable.  *See* Counter-Pls.' Mem. P&A Opp'n

Counter-Defs.' Mot. Compel Discovery ("Counter-Pls.' Opp'n Mot. Compel"), at 2–9, ECF No.

50.

The Court held a hearing on the motion to compel on May 17, 2023.  Following the hearing (and at the Court's request), Counter-Plaintiffs submitted a declaration from their counsel, Mr. Hoge.  *See* Decl. Christopher G. Hoge Supp. Counter-Pls.' Privilege Logs ("Hoge Decl."), ECF No. 57.  Relevant here, the declaration first stated that Counter-Plaintiffs were "withdraw[ing] their previous privilege objections" to certain documents and that, therefore, those documents would "be produced."  *See id.* at 1.  Second, the declaration provided further detail to support Counter-Plaintiffs' claims that the remaining documents listed in their privilege logs had been properly withheld.  *See id.* at 1–4.  Counter-Defendants filed an opposition to the declaration in which they argued that many of the remaining documents at issue are not protected from discovery by the attorney-client privilege.  *See* Counter-Defs.' Reply Decls. Christopher G. Hoge and Thomas T. Androus ("Counter-Defs.' Opp'n Decls."), ECF No. 59.  However, they also indicated that, based on Counter-Plaintiffs' more fulsome descriptions of some of the withheld documents, there were a number of documents that they were no longer seeking.  *See, e.g.*, *id.* at 9–10.

The Court held another hearing on August 30, 2023.  At that hearing, the Court determined that it needed to review the remaining documents *in camera* to assess the privileged status of those documents.  Following the hearing, Counter-Plaintiffs submitted over eighty documents for the Court's review.  It appears that some of the documents included in the file provided by Counter-Plaintiffs are records which Counter-Defendants have indicated they are no longer seeking.  The Court will not address those documents; it will instead confine its review to the approximately seventy documents which Counter-Plaintiffs contend are privileged but which Counter-Defendants still seek.  In addition to the documents themselves, Counter-Plaintiffs also

submitted two charts corresponding to their initial privilege logs.[5]  The charts are essentially truncated versions of the initial privilege logs in that the charts only list the documents discussed in the Hoge Declaration.  *See* Hoge Decl.  The charts also differ from the original privilege logs in that they provide slightly more detail than do the initial privilege logs regarding the topic or substance of the documents being withheld.

### 1.  Counter-Defendants' First Motion to Compel

As discussed, Counter-Defendants seek disclosure of approximately seventy documents which Counter-Plaintiffs contend are privileged.  Federal Rule of Civil Procedure 26(b) provides, in relevant part, that a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1); *see Alexander v. FBI* ("*Alexander I*"), 186 F.R.D. 78, 91 (D.D.C. 1998).  Counter-Plaintiffs argue that they have satisfied their obligations under the Rule because the remaining documents are covered by the attorney-client privilege.

The attorney-client privilege shelters "confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services."  *In re Lindsey*, 158 F.3d 1263, 1267 (D.C. Cir. 1998); *see also Alexander v. FBI* ("*Alexander II*"), 186 F.R.D. 102, 110–11 (D.D.C. 1998) (explaining that "communications from attorney to client are privileged only if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence" (internal alteration omitted) (quoting *United States v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990))).  The privilege exists "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests

---

[5] Counter-Plaintiffs' initial privilege logs are available as attachments to Counter-Defendants' initial motion to compel.  *See* Exs. B, C, Counter-Defs.' Mot. Compel, ECF Nos. 49-4, 49-5.

in the observance of law and administration of justice." *Banneker Ventures, LLC v. Graham*, 253 F. Supp. 3d 64, 70 (D.D.C. 2017) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

The party invoking the privilege "bears the burden of proving" that it applies, *In re Lindsey*, 158 F.3d at 1270, and must do so "by way of affidavits or other competent evidence," *Alexander v. FBI* ("*Alexander III*"), 192 F.R.D. 42, 45 (D.D.C. 2000) (quoting *Alexander II*, 186 F.R.D. at 111). Because the privilege is "narrowly construed," *United States v. Philip Morris Inc.*, 212 F.R.D. 421, 424 (D.D.C. 2002), the party invoking its protection may not simply rely on a "blanket assertion of the privilege," *Smith v. Ergo Sols., LLC*, No. 14-cv-382, 2017 WL 2656096, at *2 (D.D.C. June 20, 2017) (quoting *In re Lindsey*, 158 F.3d at 1270). Instead, "the proponent must conclusively prove each element of the privilege." *In re Lindsey*, 158 F.3d at 1270 (internal alteration omitted) (quoting *SEC v. Gulf & W. Indus.*, 518 F. Supp. 675, 682 (D.D.C. 1981)). Where, as here, a party's affidavits and evidence are not sufficient, in and of themselves, to demonstrate whether specific communications are attorney-client privileged, the court may conduct an *in camera* review to determine for itself whether the "privilege [has been] properly invoked." *Alexander III*, 192 F.R.D. at 46.

Because this is a diversity action, state law "governs the scope of the [attorney-client] privilege and waiver." *Feld v. Fireman's Fund Ins. Co.*, 292 F.R.D. 129, 137 (D.D.C. 2013); *see also Berliner Corcoran & Rowe LLP v. Orian*, 662 F. Supp. 2d 130, 134 (D.D.C. 2009). Without much analysis, Counter-Defendants suggest that Virginia law should be applied to determine whether the documents at issue are privileged and, if they are, whether Androus has waived their privileged status. *See* Counter-Defs.' Opp'n Decls. at 5 & n.2. For their part, Counter-Plaintiffs cite a few D.C. Circuit and District Court opinions, *see* Counter-Pls.' Opp'n

Mot. Compel at 5–6, and the "concise summary of the attorney-client privilege" endorsed by one

of those opinions, *see In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984). They do not

otherwise meaningfully attempt to establish whether Virginia or District of Columbia law should

be applied to determine the issues of privilege in this case. The Court will therefore apply

Virginia law to assess the privileged status of the documents at issue.[6]

Under Virginia law, the party invoking the privilege has the burden of establishing "that

[an] attorney-client relationship existed, that the communications under consideration are

privileged, and that the privilege was not waived." *Commonwealth v. Edwards*, 370 S.E.2d 296,

301 (Va. 1988). "Confidential communications between attorney and client made because of

that relationship and concerning the subject matter of the attorney's employment 'are privileged

from disclosure.'" *Id.* (quoting *Grant v. Harris*, 82 S.E. 718, 719 (Va. 1914)). What is more,

"[t]he privilege attaches to communications of the client made to the attorney's agents, including

accountants, when such agent's services are indispensable to the attorney's effective

representation of the client." *Id.*

There are certain circumstances in which a client can waive the protections of the

attorney-client privilege. One circumstance in which such waiver occurs is "when the client

places otherwise privileged matters in controversy." *Minebea Co. v. Papst*, 355 F. Supp. 2d 518,

522 (D.D.C. 2005) (quoting *Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 151 (D.C.

Cir. 1997)). Courts have referred to this type of waiver as "implied" or "at issue" waiver. *See*

*id.* The "implied waiver doctrine" is designed "to prevent 'an abuse of the [attorney-client]

privilege,' that is, to prevent the confidentiality protected by the privilege from being used 'as a

---

[6] For what it is worth, Counter-Defendants assert that there appears to be "no appreciable difference" between Virginia law and D.C. law for purposes of this motion. *See* Counter-Defs.' Opp'n Decls. at 5 n.2.

tool for manipulation of the truth-seeking process.'"  *Id.* (quoting *In re Sealed Case*, 676 F.2d 793, 807 (D.C. Cir. 1982)).

     *Communications between Androus and Ayesha Khan.*  Counter-Plaintiffs first invoke the attorney-client privilege with regard to "email exchanges" between "Androus and Ayesha Khan, an attorney with the Potomac Law Group, from whom Mr. Androus was seeking assistance regarding his [Virginia state court] appeal . . . and post-trial motions."  Hoge Decl. at 2. Although there is nothing in the relevant records to suggest that Androus ever retained Ms. Khan, the documents suggest that Androus was considering retaining Ms. Khan's services at the time the emails were exchanged.  *See In re Sealed Case*, 737 F.2d 94, 98 (D.C. Cir. 1984) (explaining that the attorney-client privilege covers relationships between attorneys and an individual who "sought to become a client" (citation omitted)).  As for the substance of the emails, many contain either explicit or implicit requests for legal advice from Androus to Ms. Khan.  Other emails are communications in which Ms. Khan provides legal advice to Androus. Emails (and, in some cases, attachments to emails) fitting these descriptions are Bates-stamped: REVIEW2022043001000355 through -0362; REVIEW2022043001001237 through -1241; REVIEW2022043001003696, -3697, and -3699 through -3701; ANDROUSS23157; ANDROUS23161; ANDROUS23164; and ANDROUS23167.  Finally, because the substance of these documents does not relate to the quality of Counter-Defendants' representation, Androus has not impliedly waived their privilege status by filing his malpractice counterclaim.  The documents need not be produced.

     Emails that are Bates-stamped REVIEW2022043001001255 and REVIEW2022043001001257 through -1260 all relate to an exchange regarding post-trial proceedings in the Virginia litigation.  Similarly, documents that are Bates-stamped

REVIEW2022043001002642 through -2650 address preparations and strategy for the Virginia appeal.  Thus, the Court finds that all of these documents are protected by the attorney-client privilege because they are sufficiently related to Ms. Khan's prospective representation of Androus in the post-trial proceedings in Virginia.  Moreover, the emails do not relate to the quality of Counter-Defendants' representation of Androus in the Virginia case, and the Court therefore concludes that the privilege has not been waived as to these documents.  The documents need not be produced.

On the other hand, the document that is Bates-stamped REVIEW2022043001000128 is simply a transmittal email and does not contain an express or implied request for legal advice.  It is therefore not covered by the attorney-client privilege and must be disclosed.

*Communications between Androus and George Sommerville.*  The one document falling into this category is Bates-stamped REVIEW2022043001000144.  It is an email exchange between Androus and attorney George Sommerville.  Although Mr. Sommerville is one of the many attorneys from whom Androus assertedly sought legal advice in connection with his appeal of the adverse jury verdict,[7] *see* Counter-Pls.' Opp'n Mot. Compel at 6–7; Hoge Decl. at 2, this particular email exchange does not request or relay legal advice, nor does it communicate confidential information.  In other words, it was improperly withheld under the attorney-client privilege and shall be disclosed.

*Communications between Androus, Peter Greenspun, and Warner Young.*  The documents in this category consist of emails between Androus and attorneys Peter Greenspun and Warner Young.  Among those documents, the document with Bates-stamp

---

[7] The other attorneys from whom Androus claims to have sought legal advice regarding his appeal are Peter Greenspun, Warner Young, Christopher Amolsch, Steve Emmert, George Doumar, Michael Tucci, Marc Albert.  *See* Hoge Decl. at 2–3.

REVIEW2022043001000729 contains essentially no substance—it simply attaches a document. The email shall be produced.  Likewise, the document that is Bates-stamped REVIEW2022043001000893 also does not relate to a request for—or the provision of—legal advice and shall therefore be produced.

The documents that bear Bates-stamps REVIEW2022043001000214 and REVIEW2022043001003206 appear to be duplicates of the same email that Androus sent to Mr. Greenspun on November 6, 2019—a point in time at which Androus was still represented by Counter-Defendants.  Further, the content of the email simply relays information (seemingly verbatim) that Counter-Defendants sent to Androus.  Given that the transmittal of the information does not appear to be implicitly requesting legal advice, the Court is not persuaded that these emails are covered by the attorney-client privilege.  They shall be produced.

The emails Bates-stamped REVIEW2022043001000881, -0886, -0887, -0892, and REVIEW2022043001003131 were also exchanged at a point in time when Androus was represented by Counter-Defendants.  Unlike the prior emails, however, these emails do implicitly seek legal advice from Mr. Greenspun (and, to a lesser extent, Mr. Young).  The documents are therefore protected by the attorney-client privilege, and the privilege has not been waived because the emails do not contain commentary regarding the quality of Counter-Defendants' representation.  They need not be produced.

*Draft Engagement Letter.*  It does not appear that Counter-Plaintiffs included the draft engagement letter between Androus and his current counsel amongst the files provided to the Court for *in camera* review.[8]  Counter-Defendants argue that, to the extent the draft letter reveals

---

[8] The draft engagement letter is referred to as "Item No. 74" in Mr. Hoge's Declaration. *See* Hoge Decl. at 2.

"fee arrangements" between Androus and his counsel, that information should be disclosed.  *See* Counter-Defs.' Opp'n Decls. at 12.  Counter-Defendants are correct that "fee arrangements do not fall within the attorney-client privilege because they are not the kinds of disclosures that would not have been made absent the privilege and their disclosure does not incapacitate the attorney from rendering legal advice."  *Vingelli v. U.S. Drug Enf't Agency*, 992 F.2d 449, 452 (2d Cir. 1993); *see also Lefcourt v. United States*, 125 F.3d 79, 86 (2d Cir. 1997) ("As a general rule, . . . fee information [is] not privileged.").  Thus, to the extent the draft letter reveals fee arrangements, that information must be disclosed.  On the other hand, information in the draft letter that "reveal[s] confidences about the nature of legal services rendered" may be redacted. *Berliner Corcoran & Rowe LLP v. Orian*, 662 F. Supp. 2d 130, 134 (D.D.C. 2009).

      *Communications between Androus and Christopher Amolsch.*  The one document falling into this category is Bates-stamped REVIEW2022043001000876, and it is an email exchange between Androus and attorney Christopher Amolsch.  According to Androus's declaration, he contacted Mr. Amolsch for "assist[ance] . . . finding counsel to handle [his] appeal."  *See* Androus Decl. at 2.  That being so, and given that the contents of the email do not suggest that Androus sent the email with the intention of receiving legal advice from Mr. Amolsch, the Court concludes that the document is not shielded by the attorney-client privilege.  It shall be produced.

      *Communications between Androus and Steve Emmert.*  The documents included in this category are email exchanges between Androus and Steve Emmert, "one of the attorneys who handled" Androus's Virginia appeal.  *See* Hoge Decl. at 3.  They are Bates-stamped REVIEW2022043001001004, REVIEW2022043001001129, REVIEW2022043001001741 through -1745, and REVIEW2022043001001748 through -1751.

The email bearing Bates-stamp REVIEW2022043001001004 contains a request for legal advice from Androus to Mr. Emmert, as well as a response in which Mr. Emmert provides the requested advice.  The communication does not reflect any information regarding Counter-Defendants' representation of Androus, and therefore need not be produced.

The email bearing Bates-stamp REVIEW2022043001001129 neither requests nor conveys legal advice.  It is simply an invitation to join a conference call and—given that Counter-Defendants were also invited to participate in the call—does not reveal any confidential information.  It shall be produced.

The emails bearing Bates-stamps REVIEW2022043001001744, -1745, and -1748 through -1751 are all variations of an email chain relating to a request for legal advice from Androus to Mr. Emmert.  Moreover, one of the documents (REVIEW2022043001001749) conveys legal advice from Mr. Emmert to Androus.  None of the documents contains information regarding Counter-Defendants' representation of Androus.  The documents, therefore, do not need to be produced.

Similarly, the emails that are Bates-stamped REVIEW2022043001001741 through -1743 are variations of the emails discussed in the preceding paragraph.  These emails contain additional requests for legal advice from Androus regarding the Virginia litigation.  They also contain and convey legal advice from Mr. Emmert to Androus.  Consequently, the documents are shielded by the attorney-client privilege and need not be produced.

*Communications between Androus and Warner Young.*  The documents falling into this category are Bates-stamped REVIEW2022043001001558, -1559, and -2541.  They are email exchanges between Androus and Warner Young in which Androus is either explicitly seeking legal advice or Mr. Young is providing legal advice in connection with post-trial developments

in the Virginia litigation.  Moreover, the substance of the emails does not concern the quality of Counter-Defendants' representation, and therefore does not go to the issues Counter-Plaintiff has put in play by filing his malpractice claim.  These documents need not be produced.

*Communications between Androus and Peter Eliades.*  The documents falling into this category are Bates-stamped REVIEW2022043001002480, -2481, and -2483.  They are email communications between Androus and Peter Eliades.  Mr. Eliades—who is a lawyer and a judge—is also Androus's cousin.  Although the emails at issue do indicate that Androus was implicitly seeking legal advice from Mr. Eliades, Androus has provided no evidence suggesting that he and Mr. Eliades ever "manifest[ed] an intention to create [an] attorney/client relationship."  *Headfirst Baseball LLC v. Elwood*, 999 F. Supp. 2d 199, 209 (D.D.C. 2013) (quoting *In re Ryan*, 670 A.2d 375, 379 (D.C. 1996)).  Nor is there evidence from which the Court may conclude that Androus "sought to become a client" of Mr. Eliades.  *See In re Sealed Case*, 737 F.2d at 98.  These documents are therefore not covered by the attorney-client privilege, and they shall be produced.

*Communications between Androus, Michael Tucci, and Marc Albert.*  The only document falling into this category is Bates-stamped REVIEW2022043001002671, and it is an email from Androus to attorneys Michael Tucci and Marc Albert.  The email implicitly requests legal advice from Mr. Tucci.  From the face of the email and Androus's sworn declaration, it is plausible that Androus was seeking to establish an attorney-client relationship with Mr. Tucci and Mr. Albert.  Moreover, the communication itself is benign and—contrary to Counter-Defendants' concerns— does not contain any comments from Androus regarding Counter-Defendants' representation of him in the Virginia litigation.  The document need not be produced.

*Communications between Androus and Vanessa Garcia.*  The documents in this category are Bates-stamped ANDROUS-SUPP-00079, -00080, and -00081.  They are email communications between Androus and Vanessa Garcia, a legal assistant at the Greenspun Shapiro law firm.  *See United States v. Singhal*, 842 F. Supp. 2d 1, 5 (D.D.C. 2011) ("[T]he attorney-client privilege undeniably extends to communications with one employed to assist the lawyer in the rendition of professional legal services." (internal quotation marks omitted)).  Counter-Plaintiffs attest that they were unable to find unredacted versions of the first two documents, and so have instead attached redacted versions.  From what the Court can glean, the documents appear to transmit a fee arrangement agreement (ANDROUS-SUPP-00081) between Androus and the Greenspun Shapiro law firm.  As explained above "fee arrangements [typically] do not fall within the attorney-client privilege because they are not the kinds of disclosures that would not have been made absent the privilege and their disclosure does not incapacitate the attorney from rendering legal advice."  *See Vingelli*, 992 F.2d at 452.  That being so, Counter-Plaintiffs shall produce the retainer letter but may redact portions of the letter that "reveal confidences about the nature of legal services rendered."  *Berliner Corcoran & Rowe LLP*, 662 F. Supp. 2d at 134.  Given that the redacted versions of the transmittal emails do not reveal confidential information, they shall be produced as well.

### 2.  Counter-Defendants' Supplemental Motion to Compel

Finally, Counter-Defendants seek to compel Counter-Plaintiffs to produce copies of handwritten notes that Androus took during three expert depositions.  *See generally* Counter-Defs.' Suppl. Mot. Compel.  Counter-Plaintiffs contend that they are not required to produce the notes because the notes are protected by the attorney-client privilege or the attorney work product doctrine.  *See* Counter-Pls.' Mem. P. & A. Opp'n Counter-Defs.' Suppl. Mot. Compel

("Counter-Pls.' Opp'n Suppl. Mot. Compel") at 5–8, ECF No. 55.  At the August 30, 2023

hearing, the Court determined that *in camera* inspection of the notes was necessary.  The Court

has since reviewed the notes *in camera* and concludes that Counter-Plaintiffs need not produce

them.

That is because, to the extent Counter-Plaintiffs contend that the notes are shielded by the

attorney work product doctrine, the Court agrees.  The attorney work-product doctrine "reflects

the strong 'public policy underlying the orderly prosecution and defense of legal claims.'"

*United States v. Williams Cos.*, 562 F.3d 387, 393 (D.C. Cir. 2009) (quoting *Hickman v. Taylor*,

329 U.S. 495, 510 (1947)).  The work-product protection extends to "written materials that

lawyers prepare 'in anticipation of litigation,' ensuring that lawyers can prepare for litigation

without fear that opponents may obtain their private notes, memoranda, correspondence, and

other written materials."  *Id.* (internal quotation marks omitted).  Originally a creature of the

common law, Federal Civil Rule of Procedure 26(b)(3) now "codifies the work-product

doctrine."  *Upjohn Co.*, 449 U.S. at 398.  Accordingly, "unlike the attorney client privilege, the

work product privilege is governed, even in diversity cases, by a uniform federal standard."  *Feld

v. Fireman's Fund Ins. Co.*, 991 F. Supp. 2d 242, 247 (D.D.C. 2013) (internal alteration omitted)

(quoting *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988)).

It is well-established that, "although the doctrine is known as the *attorney* work-product

doctrine, work product created by non-attorneys can also be protected if it is 'so intertwined with

the legal analysis as to warrant protection.'"  *United States v. ISS Marine Servs., Inc.*, 905 F.

Supp. 2d 121, 134 (D.D.C. 2012) (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 139

(D.C. Cir. 2010)).  Moreover—and more to the point—Rule 26 provides that "a party may not

discover documents and tangible things that are prepared in anticipation of litigation or for trial

*by or for another party* or its representative." Fed. R. Civ. P. 26(b)(3) (emphasis added). That

is, the work product doctrine extends "to documents and things prepared for litigation or trial *by .*

*. . the adverse party itself*." 8 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus,

Federal Practice and Procedure § 2024 (3d ed. 2010) (emphasis added); *see also U.S. Equal*

*Emp. Opportunity Comm'n v. George Washington Univ.*, 342 F.R.D. 161, 171 & n.7 (D.D.C.

2022). Here, there is no dispute that Androus—a party to the litigation—composed the notes. In

a sworn declaration, Androus asserts that he took the notes so that he "might better communicate

[his] thoughts about [the expert depositions] with [his] attorneys." *See* Ex. 2, Counter-Pls.'

Opp'n Suppl. Mot. Compel at 1, ECF No. 55-2. And the Court's *in camera* review of the notes

confirms that they contain Androus's impressions of specific aspects of the testimony, questions

for his lawyer, and thoughts regarding legal strategies his lawyer could pursue. In other words,

the Court concludes they were made in anticipation of the ongoing litigation and are therefore

covered by Rule 26(b)(3).[9]

Counter-Defendants mount two responses. First, they contend that, even if the notes are

protected by the work product doctrine, they have demonstrated a "substantial need" for the

notes' production. Counter-Defs. Suppl. Mot. Compel at 9–10. The Court disagrees. As the

D.C. Circuit has explained, an adverse party may discover work product "if 'the party shows that

it has substantial need for the materials to prepare its case and cannot, without undue hardship,

obtain their substantial equivalent by other means,' so long as counsel's 'impressions,

conclusions, opinions, or legal theories' are not disclosed." *FTC v. Boehringer Ingelheim*

*Pharms., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015) (quoting Fed. R. Civ. P. 26(b)(3)(A)-(B)).

---

[9] Because the Court concludes that the notes are covered by the work product doctrine codified in Federal Rule of Civil Procedure 26(b)(3), the Court need not and will not decide whether the notes are, as Counter-Plaintiffs argue, also shielded by the attorney-client privilege.

The party seeking discovery bears the burden of demonstrating "substantial need" and "undue hardship." *See id.* at 155.  The moving party generally meets this burden by "demonstrat[ing] that the materials are relevant to the case, the materials have a unique value apart from those already in the movant's possession, and 'special circumstances' excuse the movant's failure to obtain the requested materials itself." *Id.*

As best the Court can tell, Counter-Defendants argue that they have a "substantial need" for Androus's notes because those notes may contradict other assertions Androus has made during both this case and the Virginia litigation.  *See* Counter-Defs.' Suppl. Mot. Compel at 9–10.  They assert that Androus has made "sworn-to assertions in this litigation which flatly contradict those that he made under oath in the [Virginia] Litigation," and they add that Androus has admitted that he has a "compromised memory."  *Id.* at 10.  The Court fails to see how these assertions regarding Androus's allegedly contradictory statements and compromised memory demonstrate a "substantial need" for the handwritten notes that Androus took during three expert depositions.  And Counter-Defendants have not cited—and the Court has not found—any authority for the proposition that a litigant's prior inconsistent statements or alleged memory issues entitle his adversary to discover the notes taken by the litigant during depositions at which they were both in attendance.

Second, Counter-Defendants argue that the notes should be disclosed pursuant to Federal Rule of Evidence 612.  Rule 612 provides that, when a deponent "uses a writing to refresh memory" either "(1) while testifying; or (2) before testifying," the "adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and

to introduce in evidence any portion that relates to the witness's testimony."[10]  Fed. R. Evid.

612(a)-(b); *see also Dickerson v. District of Columbia*, No. 09-cv-2213, 2021 WL 1840396, at

*1 (D.D.C. May 7, 2021).  If the witness "uses the writing to refresh [his] memory *before*

testifying, however, the adverse party is only entitled to production of the writing 'if the court

decides that justice requires'" it.  *Dickerson*, 2021 WL 1840396, at *1 (quoting Fed. R. Evid.

612(a)(2)); *see also In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 143 (D.C. Cir. 2015).

Moreover, the mere fact that a witness used or "consulted" a document to prepare for testimony

does not, in and of itself, entitle the adverse party to the document's production.  *Dickerson*,

2021 WL 1840396, at *2.  Instead, an adverse party "is only entitled to those documents that

'influenced the witness's testimony.'"  *Id.* (quoting *In re Kellogg Brown & Root*, 796 F.3d at

144).  Put slightly differently, Rule 612 only requires parties to produce "those documents upon

which [a witness] relied to answer specific, substantive questions."  *Id.* at *3; *see also Sporck v.

Peil*, 759 F.2d 312, 318 (3d Cir. 1985) (explaining that adverse party is only entitled to

documents "that [witness] relied on . . . in giving his testimony, or . . . those documents [that]

influenced his testimony").

      Counter-Defendants do not contend that Androus used his notes to refresh his memory

while he was testifying.  Instead, they argue that Rule 612 compels the notes' disclosure because

Androus used them to prepare for his deposition.  *See* Counter-Defs.' Suppl. Mot. Compel at 9;

*see also* Ex. B, Counter-Defs.' Suppl. Mot. Compel at 5–7, ECF No. 54-2.  Fatally, however,

during Androus's deposition, Counter-Defendants failed to establish that Androus's review of his

---

[10] Rule 612 is made applicable to depositions and deposition testimony by Rule 30(c) of the Federal Rules of Civil Procedure, which states that "[t]he examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence."  Fed. R. Civ. P. 30(c).

notes influenced his testimony or formed the basis for his answers to any specific, substantive

questions.  Rather, the deposition transcript reveals that Counter-Defendants' counsel only

inquired *generally* about what Androus had done to prepare for his deposition:

> Q       What, if anything, did you do to prepare for your deposition here today?
>
> A       I tried to get a good night's sleep, unsuccessfully.  I read the closing
> arguments of the trial transcript.  I read – I created my timeline.  I tried to get an
> up-to-date accounting of my expenses, and I wrote, you know, what I – not
> including my – not from this case, but from my – related to my appeal.  *I read my
> notes from the previous depositions that have been given this week*.  I read
> documents related to the case.
>
> . . .
>
> Q       And you said you reviewed your notes from the depositions that have
> happened this week; is that correct?
>
> A       Correct.

Ex. B, Counter-Defs.' Suppl. Mot. Compel at 5–6 (emphasis added).  This line of questioning

does not show that Androus's pre-deposition review of his notes "influenced [his] testimony" in

any way.  *See Dickerson*, 2021 WL 1840396, at *2 (quoting *In re Kellogg Brown & Root*, 796

F.3d at 144).  Equally important, the excerpted testimony illustrates that Counter-Defendants'

counsel did not lay the proper foundation under Rule 612 for production of Androus's notes.

That is, Counter-Defendants' counsel "inquired about the documents upon which [Androus] had

relied" *before* eliciting any specific, substantive testimony and then inquiring into the basis for

Androus's responses. *See id.*  "Without first eliciting [such] testimony, there existed no basis for

[counsel] asking [Androus] the source of that testimony."  *See id.* (quoting *Sporck*, 759 F.2d at

318); *see also id.* at *2–3 (illustrating how to lay a proper foundation under Rule 612).

Counter-Defendants' failure to lay a proper foundation under Rule 612 provides

sufficient grounds on which to deny their supplemental motion to compel.  But even if that were

not enough, the Court also observes that Rule 612(a)(2) entitles the opposing party to the

production of a writing used to refresh a witness's memory "before testifying" only "if the court decides that justice" so requires.  Fed. R. Evid. 612(a)(2).  Despite that qualification, Counter-Defendants make no argument that justice requires production of the notes.  Rather, they cursorily assert that "[s]ince the [n]otes were admittedly taken and then used to refresh Androus's memory, they should be turned over."  *See* Counter-Defs.' Suppl. Mot. Compel at 9.  And the Court's own review of the notes does not convince it that justice requires that Androus's notes be turned over to Counter-Defendants.  Therefore, Counter-Defendants' motion to compel the production of the notes is denied.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs'/Counter-Defendants' motion to dismiss (ECF No. 58) is **DENIED**; Plaintiffs'/Counter-Defendants' motion for sanctions (ECF No. 70) is **DENIED**; Plaintiffs'/Counter-Defendants' motion to compel (ECF No. 49) is **GRANTED IN PART AND DENIED IN PART**; and Plaintiffs'/Counter-Defendants' supplemental motion to compel (ECF No. 54) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 22, 2024                                                  RUDOLPH CONTRERAS
                                                                                        United States District Judge